## MULLAN & Another *v.* UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF CALIFORNIA.

Argued April 1, 1886.—Decided May 10, 1886.

When the authority of the Attorney-General of the United States to commence proceedings to vacate a patent for public lands does not appear on the face of the bill, it may be shown in this court if the bill is objected to here for want of it.

Coal lands are mineral lands within the meaning of that term as used in the statutes regulating the disposition of the public domain.

As coal lands were excepted from the grants to California of Sections 16 and 36 in § 6 of the act of March 3, 1853, 10 Stat. 244, 246, the State could not under the provisions contained in § 7 of that act, Ib. 247, select coal lands in lieu of such Sections 16 and 37 as might be occupied before survey, or reserved for public uses, or taken by private claims.

The United States can maintain a suit in equity in its own name to vacate the selection and listing of coal lands to the State of California by the proper authority of the government under the act of March 3, 1853, 10 Stat. 244: and, upon its appearing that the lands so listed were coal lands and were known to be such at the time of the listing and selection by the State officers and by those for whose benefit the listing was made, a decree should be entered vacating the title of the State and of those claiming under it.

This was a bill in equity to annul and set aside a listing of coal lands to the State of California, and patents of the same granted by the State. The case is stated in the opinion of the court.

*Mr. Assistant Attorney General Maury* on behalf of the United States stated that this suit, although prosecuted in the

name of the United States, was prosecuted by private parties and at private cost. *Mr. Maury* filed a brief on behalf of appellee; and also showed to the court the authority of the Attorney General for the commencement of the proceedings.

*Mr. Walter H. Smith* for appellants.

*Mr. W. W. Morrow* for appellee.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This was a suit brought by the United States to vacate and annul the title of John Mullan and Francis Avery to the N. ½, sec. 8 T. 1 N., R. 1 E., Mount Diablo meridian, listed by the Secretary of the Interior on the 3d of January, 1871, to the State of California as a school indemnity selection, on the ground that when the selection was made and when it was listed the land was coal land, and so known to be, both by the officers of the State who made the selection, and by Mullan and Avery when they afterwards acquired title from the State. The facts are these:

The land in question lay in the midst of a coal-bearing district, and had upon it a valuable coal bed. It was rugged and broken, and of very little if any value for agricultural purposes. As early as 1861 the Black Diamond Coal Mining Company took possession of it and opened a coal mine. The company erected at great expense, upon this and adjoining land, all the necessary works for mining, hoisting, and shipping the coal, and continued its operations on the property extensively from the time it entered into possession until evicted in 1877, at the suit of Avery. Its possession was open and notorious, and the principal market for its coal was in San Francisco, or with persons trading there. There was also located on this and adjoining property quite a large mining town, which sometimes had more than one thousand inhabitants. The lands in the township were surveyed and divided into sections in March, 1864, under the direction of the United States surveyor-general. In the progress of these surveys the mines were found, and to some extent indicated on the plats, which contained abundant evidence of the coal-bearing character of this particular tract.

On the 13th of May, 1865, Frank Barnard, an officer or agent of the Black Diamond Coal Mining Company, applied to the locating agent of the State of California, under the provisions of a statute of the State entitled "An act to provide for the sale of certain lands belonging to the State," approved April 27, 1863, to purchase these lands and to have them located under the authority of an act of Congress of March 3, 1853, ch. 145, § 7, 10 Stat. 247, in lieu of an equal quantity of school lands which had in some way been lost to the State. In accordance with this application the location was made for the use of Barnard on the 30th of June, 1865, and approved by the State surveyor-general on the 11th of August. Barnard, however, did not pay for the land, and consequently his title under the location was never perfected.

On the 23d of August, 1868, while the Black Diamond Company was in possession and actually working its mine, Mullan applied to the surveyor-general of California to purchase the land from the State, as land which had before been selected as school section indemnity. The surveyor-general at first objected because the land was coal land. After some conversation on the subject, in which Mullan was told that the lands were in the neighborhood of the Mount Diablo coal mine and were probably coal lands, his application for the purchase was accepted, he insisting that the lands were State lands, and that the register of the land office had acknowledged the right of the State to make the selection. This acceptance was on the 25th of August, 1868, and afterwards, on the 27th of April, 1869, the surveyor-general made a formal certificate, of which the following is a copy:

"STATE OF CALIFORNIA,
"OFFICE OF SURVEYOR-GENERAL,
"SACRAMENTO, 27*th April* 1869.

"I hereby certify that, in accordance with the provisions of an act entitled 'An act to provide for the management and sale of the lands belonging to the State,' approved March 28th, 1868, I have located, as a portion of the school lands, 320 acres of public land in the county of Contra Costa, at the request

and for the use of John Mullan. Said land is described as follows:

"N. ½ of sec. 8, T. 1 N., R. 1 E., Mount Diablo meridian.

"Taken in lieu of E. ½ of sec. 16, T. 2 N., R. 8 W., Mount Diablo meridian.

"This location has been made by me in the name and for the benefit of the State of California, at the U. S. land office for the San Francisco district, in the city of San Francisco, and with the consent of John F. Swift, register of said district, bearing date the 28th day of May, A.D. 1865, and the same is entered and numbered upon my register of locations. The said location is hereby approved, and the treasurer of Contra Costa county shall receive in payment therefor, from John Mullan, one hundred and one $\frac{65}{100}$ (101.65) dollars, within fifty days from the date of the surveyor-general's approval, being twenty per cent. of the purchase money, and interest on the balance in advance, at the rate of ten per cent. per annum from the date of the approval of the location in the surveyor-general's office.

"JOHN W. BOST, *Surveyor-General.*"

Afterwards, on the 21st of May, Mullan having made the advance payment, a certificate of purchase was executed and delivered to him.

The selection was at some time reported to the General Land Office, and on the 3d of January, 1871, listed, with other tracts, by the Secretary of the Interior to the State, "subject to any interfering rights that may exist in them."

On the 28th of March, 1871, Mullan got from Avery $1000 and assigned the certificate of purchase to him as collateral security, at the same time agreeing that on the sale of the land Avery might retain one-sixth of the purchase money, and also the $1000 and interest. At the same time he also executed to Avery a formal assignment of all and every his right or cause of action against the Black Diamond Coal Company for taking coal from the premises. Afterwards Avery paid the State the balance due on the purchase money and received a State patent for the land on the 5th of April, 1871. Mullan

had resided in San Francisco for at least a year before he made his application for the purchase, and was engaged in real estate business. Avery had also resided there from December 3, 1868, and from his testimony appears to have been familiar with operations of the character of those in which Mullan was engaged.

Not long after Avery got his patent he brought suit against the Black Diamond Company to recover possession of the property and $1,350,000 for the value of coal taken from it. This suit resulted in a judgment in his favor, on the 6th of June, 1877, for the land and $1500 damages. He then brought another suit to recover the value of coal taken from the land during the pendency of the former one, in which he claimed damages to the amount of $3,000,000.

After the first suit was begun the coal company applied to the General Land Office for a recall of the listing of the land to the State, but on an examination of the matter this was refused on the 14th of March, 1872. After the second suit was brought, the Attorney-General, on the application of the company, authorized a bill to be filed in the name of the United States to set aside the title of the State, "upon the understanding that any and all costs and expenses in the matter shall be defrayed by the applicants, and that the proceeding shall be subject to the direction and control of the Attorney-General, in order that the interests of the government may be fully protected and justice done to any and all parties interested." Under this authority the present bill was filed by the United States attorney for the District of California, and signed:

"CHARLES DEVENS, *Attorney-General.*
By PHILIP TEARE,
*United States Attorney for the District of California.*
"HOYT & M'KEE,
*Special Attorneys and Counsel.*"

Upon these facts the Circuit Court entered a decree vacating the title of the State and of Mullan and Avery, and from that decree this appeal was taken.

It is first objected that the bill should be dismissed, because

it does not show on its face that it was filed by the Attorney-General. On the argument, however, the Assistant Attorney-General produced from the Department of Justice a certified copy of an order of the Attorney-General directing the United States attorney for the District of California to proceed in the matter, and this it was held in *Western Pacific Railroad Co.* v. *United States*, 108 U. S. 512, was enough to overcome such an objection. There is no doubt that the bill was filed on the request of the coal company, and that it is expected some advantage will accrue indirectly to that company from a decree vacating the title under the State selection; but, if the title is vacated the lands will be restored to the public domain, and be subject to sale by the United States as coal lands. The United States have, therefore, a direct pecuniary interest in the suit, and this being the case, it is a matter of no importance that others may possibly be benefited by the decree which may be obtained. The acts of July 1, 1864, 13 Stat. 343, ch. 205, and March 3, 1865, 13 Stat. 529, ch. 107, make ample provisions for the sale of such lands at a price not less than twenty dollars an acre.

The important question in the case is whether the land, being coal land, was open to selection by the State as lieu school land. This was most elaborately considered by the circuit judge, and his opinion, reported in *United States* v. *Mullan*, 7 Sawyer, 466, leaves little to be said on the subject. In *Mining Co.* v. *Consolidated Mining Co.*, 102 U. S. 167, this court decided that "the grant of the sixteenth and thirty-sixth sections of public land to the State of California for school purposes, made by the act of March 3, 1853, was not intended to cover mineral lands. Such lands were by the settled policy of the general government excluded from all grants" at that time, and we quite agree with the circuit judge that "if sections 16 and 36, being mineral lands, do not pass by the terms of the statute, there certainly is no good reason for permitting the same kind of lands to be selected under § 7, in lieu of sections 16 and 36." The confirmatory act of July 23, 1866, 14 Stat. 218, ch. 219, expressly excludes from its operation all selections of mineral land. The case, therefore, turns on the question whether coal

lands are mineral lands within the meaning of that term as used in the statutes regulating the disposition of the public domain.

The first statute which made any reference to minerals on the public lands was that of September 4, 1841, 5 Stat. 453, 455, ch. 16, § 10, which provided that no pre-emption entry should be made on "lands on which are situated any known salines or mines;" and by the act of July 1, 1864, 13 Stat. 343, ch. 205, § 1, it was provided that "any tracts embracing coal beds or coal fields, constituting portions of the public domain, and which as 'mines' are excluded from the pre-emption act of 1841, and which under past legislation are not liable to ordinary private entry," might be disposed of at a price not less than twenty dollars an acre. This is clearly a legislative declaration that "known" coal lands were mineral lands within the meaning of that term as used in statutes regulating the public lands, unless a contrary intention of Congress was clearly manifested. Whatever doubt there may be as to the effect of this declaration on past transactions, it is clear that after it was made, coal lands were to be treated as mineral lands. That the land now in dispute was "known" coal land at the time it was selected no one can doubt. It had been worked as a mine for many years before, and it had upon its surface all the appliances necessary for reaching, taking out, and delivering the coal. That Barnard knew what it was when he asked for its location for his use is absolutely certain, because he was one of the agents of the coal company at the time, and undoubtedly acted on its behalf in all that he did. If Mullan and Avery were ignorant of the fact when they acquired their respective interests in the property, it was because they wilfully shut their eyes to what was going on around them, and purposely kept themselves in ignorance of notorious facts. But the evidence satisfies us entirely that they were not ignorant. The assignment of Mullan to Avery of his claim against the company for coal taken out, made at the same time that he transferred the certificate of purchase, shows the knowledge of all the facts by both when Avery acquired his interest, and Mullan's information on the subject is shown by what took place between him

and the surveyor-general of California when he made his purchase.

At the time the selection was actually made, therefore, it cannot be doubted that the land was mineral land; both in law and in fact, within the meaning of the act under which the State and those who purchased from the State undertook to acquire title, and we agree with the Circuit Court in opinion that the rights of the parties are to be determined by the law as it stood then. Such being the case, we have no hesitation in deciding that the land was not open to the State for selection.

It remains to consider whether, since the land was in fact listed to the State by the proper officers of the government, the selection can be vacated and the titles under it annulled in a suit in equity brought by the United States directly for that purpose; and about this we have no more doubt than the Circuit Court seems to have had. The lands were, as we have seen, known coal lands. No one seriously disputes that now; and, in our opinion, upon the well-established facts, Mullan and Avery occupy no better position than the State would if no patent had been issued to Avery. They are in every sense of that term purchasers with notice. The case is, therefore, directly within the decisions of this court in *McLaughlin* v. *United States*, 107 U. S. 526, and *Western Pacific Railroad Co.* v. *United States*, 108 U. S. 510, where it was distinctly held that patents to the Western Pacific Railroad Company for known mineral lands could be cancelled on a bill in equity filed by the United States for that purpose. It is no doubt true that the actual character of the lands was as well known at the Department of the Interior as it was anywhere else, and that the Secretary approved the lists, not because he was mistaken about the facts, but because he was of opinion that coal lands were not mineral lands within the meaning of the act of 1853, and that they were open to selection by the State; but this does not alter the case. The list was certified without authority of law, and, therefore, by a mistake against which relief in equity may be afforded. As was said in *United States* v. *Stone*, 2 Wall. 525, 535 : " The patent is but evidence of a

grant, and the officer who issues it acts ministerially and not judicially. If he issues a patent for land reserved from sale by law, such patent is void for want of authority. But one officer of the land office is not competent to cancel or annul the act of his predecessor. That is a judicial act, and requires the judgment of a court." This language is equally applicable to the present case, and its correctness has been often recognized. *Moore* v. *Robbins*, 96 U. S. 530, 533 ; *United States* v. *Schurz*, 102 U. S. 378, 396 ; *Steel* v. *Smelting Company*, 106 U. S. 447, 454 ; *Moffat* v. *United States*, 112 U. S. 24.

The decree of the Circuit Court is        *Affirmed.*