## NORTHERN PAC. R. CO. *v.* SANDERS *et al.*

*(Circuit Court of Appeals, Ninth Circuit. January 25, 1892.)*

RAILROAD GRANTS—RESERVATIONS—LOCATION OF MINING CLAIMS.

Act July 2, 1864, granting land to the Northern Pacific Railroad Company to aid in the construction of its road, which creates a reserve of the odd-numbered sections of lands "not mineral," within the limits defined, "which are free from pre-emption or other claims or rights," from the time of filing a plat of the general route in the general land-office, does not prevent persons taking up mining claims in the reserved lands after the filing of such map, and before the definite location of the road; and it does not avail the railroad company that the lands so located under mining claims are in fact non-mineral lands. *Buttz* v. *Railroad Co.*, 7 Sup. Ct. Rep. 100, 119 U. S. 55, and *Denny* v. *Dodson*, 32 Fed. Rep. 899, distinguished. 47 Fed. Rep. 604, affirmed.

Error to the Circuit Court of the United States for the District of Montana.

At Law. Ejectment by the Northern Pacific Railroad Company against Junius G. Sanders and others. From a judgment for defendants overruling plaintiff's demurrer to the answer plaintiff brings error. Affirmed.

*Fred. M. Dudley,* for plaintiff in error.

*Wilbur F. Sanders,* for defendants in error.

Before HANFORD, HAWLEY, and MORROW, District Judges.

HANFORD, District Judge. This action was brought by the Northern Pacific Railroad Company to recover possession of section 21, township 10 N., of range 3 W., in the state of Montana. By an amended complaint the plaintiff has pleaded the grant of lands made to it by act of congress, and the facts upon which it relies to establish its title to the premises as part of said grant. To said amended complaint the defendants answered, admitting all the facts alleged by the plaintiff, but to avoid the effect of such admissions, and to controvert the legal conclusions contended for by the plaintiff, set up by affirmative allegations certain additional facts. A general demurrer to this answer was overruled, and thereupon, the plaintiff having elected to not plead further, judgment was given for the defendants. By writ of error the case has been brought to this court for review. The portions of the act of congress which must be considered in deciding this case are here quoted:

"Sec. 3. That there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the route of said railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of said

road is definitely fixed, and the plat thereof filed in the office of the commissioner of the general land-office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections."

"Sec. 6. That the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale or entry or pre-emption before or after they are surveyed, except by said company, as provided in this act."

The material facts of the case, as stated in the pleadings, are as follows: The land in controversy is an odd-numbered section of non-mineral land within the limits of the grant. On the 21st day of February, 1872, the plaintiff filed a map of its general route in the general land-office, and on the 22d day of April, 1872, the commissioner of the general land-office, under the direction of the secretary of the interior, by a circular directed the local land-office for the Helena district, in which said land is situated, to withdraw from sale or location, pre-emption or homestead entry, all the odd-numbered sections of public lands within 40 miles on each side of the line of general route of the plaintiff's road, as fixed by the filing of said map. On the 6th day of July, 1882, the portion of the line of the plaintiff's road opposite to the land in controversy was definitely located. On different dates subsequent to receipt at the local land-office of the circular above mentioned, and prior to the definite location of the line of plaintiff's road, persons named in the answer located all of this section 21 as mining ground, and endeavored to acquire title thereto from the government under the laws relating to mineral lands of the United States. To show the nature of these supposed mining claims, and what was done in asserting and endeavoring to maintain them, we copy a portion of the answer:

"On the 2d day of August, 1880, Theodore Kleinschmidt, Edward W. Knight, Henry M. Parchen, Charles K. Wells, George P. Reeves, David H. Cuthbert, Cornelius Hedges, and Stephen E. Atkinson, each being then and there a citizen of the United States, and each having theretofore filed upon a certain separate twenty acres on the north-east quarter of said section according to the laws of the territory of Montana and the mining usages and customs then in force in the unorganized mining district in which said land was situated, and being in all respects qualified to enter mineral land under the laws of the United States, did enter into the possession of, and did enter in the United Stated land-office, and did file upon said quarter of said section in the land-office of the United States at Helena, Montana, in which district said land was situated, as mineral land, and did apply for a patent therefor, and did then and there, and in due form, file an application to purchase said premises as such mineral land, and did then and there make oath before the register and receiver of said land-office that they had discovered minerals thereon, and had located the said quarter section as mineral land, and claimed the same as such for the valuable mineral deposits therein, and that they had complied with chapter 6 of title 32 of the Revised Statutes of the United States, which said application was so filed in the land-office of Helena, Mon-

tana, under the oath of the said applicants, showing that they had complied with the law aforesaid, and described the same by legal subdivision; and they did then and there, prior to filing said applications, post in a conspicuous place on the claim embraced therein, a copy of said application and notice hereinafter mentioned, which said notice did then and there remain conspicuously posted on said premises during the period of publication hereinafter mentioned; and they did then and there file with the said application in said land-office an affidavit of two persons that such notice had been so duly posted, and did then and there file a copy of said notice in the land-office with the register and receiver thereof, and by said application they requested to be permitted to purchase the same as mineral land; and they then and there undertook and offered to maintain by proof that the said premises were valuable for the gold contained therein, and were mineral lands of the United States, to which they were entitled under the laws thereof, and that they had done the requisite amount of work thereon, to-wit, work of the value of five hundred dollars, and were entitled to a patent therefor; which said application and affidavit and notice were then and there entered of record in said United States land-office by the register and receiver thereof, and the said application was set for a hearing upon their said proofs to be produced, and notice of such hearing in due form of law was given by the register and receiver in the proper newspaper designated for that purpose, and was duly published therein, which said entry, application, affidavits, and notice were in all respects formal according to law, and the said application was set down for a hearing in said land-office by the register and receiver thereof at the expiration of the period of time prescribed in said notice; and, at the date at which the same was so set, the said plaintiff having theretofore filed a protest against the perfection of the said entry, as claimed by said plaintiff, that the same was not mineral land or commercially valuable for the gold or other precious metals therein contained, the said application was continued thereafter by the consent of parties or otherwise, from time to time, and was asserted and remained pending on the 6th day of July, 1882; and thereafter the said applicants, on said 6th day of July, 1882, and thereafter as theretofore, averring their ability to prove that the said land was commercially valuable for the gold therein contained, and was mineral land within the definition of that phrase contained in the act granting lands to said plaintiff mentioned in said amended complaint, and the said applicants were on the date last aforesaid claiming, affirming, and undertaking to maintain on their application for said premises in said land-office that the same was mineral land of the United States, to which they were entitled thereunder, and was not land in quality such as was described in the grant to the said plaintiff."

The answer makes similar averments as to the other three-quarters of the section, and further alleges:

"And as to the said proceedings, and each and all of them, in the office of the county clerk and recorder of said county of Lewis and Clarke, Montana, in which county said premises are situated, and in the United States land-office at Helena aforesaid, they were in the form prescribed by law for the claim and entry of placer mining claims; and thereafter, to-wit, on the 4th day of August, 1887, the said plaintiff presented to the said register and receiver a list of lands selected by it as having been granted to it by the act aforementioned, and claimed by it thereunder, to be approved to the end that the said premises in said list described might be certified to it for patent, which list included said section twenty-one; but to approve said list or to certify said land to said company the said register and receiver and the land department of the United States refused, because of the existence on the 6th day of July, 1882, of the foregoing claims to the same as mineral lands."

Subsequently to the 6th day of July, 1882, the defendants entered into the occupancy of said section 21, and at the time this action was commenced they were in possession of the same.

The case as made presents this distinct question of law: Is the land described excluded from the grant to the Northern Pacific Railroad Company because not free from claims other than pre-emption claims at the time of the definite location of the line of plaintiff's road? We do not find in the cases wherein the supreme court has construed the grant to this company any decision of this precise question; therefore, we must be guided in our decision, in so far as the case differs from cases which have been decided by the supreme court, by elementary rules. Considering the act as a whole, and its purpose and object, and giving to every word of the granting clause some force and meaning and the usual significance thereof, we conclude that congress intended to and did except and reserve out of the grant (1) lands not owned in fee by the United States; (2) lands reserved; (3) lands sold; (4) lands granted to parties other than the Northern Pacific Railroad Company; (5) lands otherwise appropriated; (6) lands subject to pre-emption claims; (7) lands subject to claims other than pre-emption claims; (8) lands subject to pre-emption rights; (9) lands subject to rights other than pre-emption rights; (10) lands containing minerals other than iron or coal. To determine whether any particular odd-numbered section within the limits of the grant was included in, or excluded from, the grant, the condition of the tract must be considered as it existed at the time the line of the road opposite thereto was definitely fixed, and the plat thereof filed in the office of the commissioner of the general land-office. The pre-emption claims and rights to which reference is made in the grant, probably, though not necessarily, are such claims and rights as may be asserted or acquired under the act of congress commonly known as the "Pre-emption Law;" but there could be no reason for making special provisions for the protection of these which would not apply as well to claims and rights of settlers under the homestead law, and to the claims and rights of prospectors and miners, founded upon the laws made expressly to reward them for the capital invested, the labor performed, and hardships endured in efforts to discover and develop the mineral resources of the country. It would therefore be unreasonable to so construe this law as to not exclude from the grant lands subject to claims and rights existing under the homestead law, and all other laws providing for the disposal of the public lands of the United States, and granting preferences to settlers, improvers, and discoverers, as well as the lands affected by the pre-emption law. The rule that general descriptive words in a statute, when connected with words of specific import, are to be understood as being qualified by the latter so as to include only things or acts of similar kind or nature to those specifically referred to, is not violated by including in the exceptions and reservations of this grant the land subject to the claims or rights of miners and prospectors under the laws providing for the acquisition of mineral lands from the government, for all such claims and rights are similar to claims and rights under the pre-emption law. The legislation by congress relating to the

acquisition by settlers upon unappropriated agricultural lands of limited portions thereof, including the improvements made by each, and the statutes providing for the disposal to discoverers and miners of limited portions of the mineral lands, has been in pursuance of the general policy of the government to bestow and distribute the public lands upon and among those citizens who will do the most to render the same productive; and there is a general similarity in all proceedings in the land-offices of the United States by which, under the general laws, claims to particular tracts of public lands are made and titles perfected, sufficient, at least, to render the above-mentioned rule of construction inapplicable in the way in which plaintiff's counsel would have it applied in this case.

The argument is made that the act must not be so construed as to include claims to mineral lands, as such, in the same category with preemption or other claims to agricultural land. Two reasons are alleged in support of this proposition: *First.* The lands reserved from the grant are divisible into two classes,—mineral lands, which are excluded from the grant by reason of the character of the land, regardless of the condition of the title; and lands exempted by reason of the condition of the title at the time of the definite fixing of the line of the road. It is said that, as all lands containing mineral other than coal or iron are excluded under the clause of the act referring to that description of lands, the other class of exempted lands should not include any mineral lands, else the act will be subject to the criticism of uselessly providing two distinct grounds of exemption applicable to the same lands. *Second.* Claims to mineral lands cannot be supposed to have been in contemplation of congress in the making of this law, because at the date of the act there was "no act of congress or any law under which a right or claim could be initiated to mineral lands." We regard both reasons as insufficient, and the proposition itself as unsound. The fault of the first argument is well illustrated by, and a complete answer to it found in, this very case. Whether the land is or not valuable for the mineral it contains is a question of fact which may be a subject of contention, and cannot be decided without the introduction of evidence. As to this land there was such a disputed question at the time the line of plaintiff's road opposite thereto was definitely fixed, and until the decision of that question by competent authority, after due investigation, it was not and could not be known whether the land was mineral or not. But the fact that an actual controversy existed concerning the title to this land which necessarily affected the right of the plaintiff to receive the same as part of its grant was known, and appeared by the records in the government land-offices. The question was finally decided adversely to the mineral claimants. Now, suppose that the decision was based upon false testimony, and that it is erroneous, or that the evidence had been different, and an erroneous decision had been given in favor of the claimants. In either case, if the existence of a claim and litigation does not affect it, the right of the company to the land would depend less upon the actual truth as to its character than upon the decision of a contested claim; and it follows that the plaintiff would have an interest at stake,

and therefore a right to challenge every mineral claim covering any part of an odd-numbered section within the limits of its grant, and a right to introduce evidence on its part to defeat every such claim. It requires no strain of mental vision to discover the possibility of erroneous decisions in numerous instances of valuable mines claimed by persons of insufficient means to develop the same or maintain a contest according to the rules and practice of the United States land department. The provisions of the act itself show that congress did not intend that this company should have a standing, as a contestant of any class of claims which the law recognizes, antedating the definite location of the road, for not only is there an absolute omission of words limiting the application of the phrase "or other claims or rights" to non-mineral lands, but by the provision allowing the company to select lieu lands it is manifest that congress was careful to guard against, and as far as possible prevent, disputes and contention as to the lands which the company should receive. We have also the authority of repeated decisions of the supreme court for saying that the policy of the government precludes an interpretation of such a grant, which would in effect create a powerful contestant with an interest to defeat individual claimants. *Newhall* v. *Sanger*, 92 U. S. 761; *Railroad Co.* v. *Dunmeyer*, 113 U. S. 629, 5 Sup. Ct. Rep. 566; *Railroad Co.* v. *Whitney*, 132 U. S. 357, 10 Sup. Ct. Rep. 112.

The second reason or argument is answered by the fact that the grant is not so worded as to imply that a claim, to have the effect of excluding land from the grant, must be founded upon an act of congress or an express provision of any law. It would be a misconstruction of the law to even modify the force of the sentence by interpolating into it the adjective "lawful," as said in the opinion of the court by Mr. Justice DAVIS in *Newhall* v. *Sanger*, 92 U. S. 765. "There is no authority to import a word into a statute in order to change its meaning." Much less can there be any authority or jurisdiction for construing a grant by narrowing a reservation made therein for the benefit of the people in general, by ascribing to it a meaning different from anything which its words express. Although there was no statute providing for the sale or bestowal of mineral lands at the time of the grant to plaintiff, congress had the right to and did afterwards make such a law, and under it claims could be and were lawfully initiated prior to the definite fixing of the line of plaintiff's road. We think that the reservations in the plaintiff's grant were made in contemplation of future legislation as well as the then existing laws. We also hold that claims to mineral lands could be lawfully initiated by discovery, possession, and development, according to the custom of miners and local regulations at and previous to the date of plaintiff's grant. For more than a score of years before there was a statute authorizing a conveyance from the government of title to mineral lands, the mines found chiefly in the public lands of the United States, situated in California, Colorado, Nevada, and the other states and territories west of the Rocky mountains, yielded their wealth to hundreds of thousands of individuals whose right to appropriate the precious metals extracted from their mining claims according to such customs

and regulations were never questioned by governmental authority. In the opinion of the supreme court in the case of *Forbes* v. *Gracey*, 94 U. S. 763, it is said that "it is very true that congress has by statutes and by tacit consent permitted individuals and corporations to dig out and convert to their own use the ores containing the precious metals which are found in the lands belonging to the government without exacting or receiving any compensation for those ores. It has gone further, and recognized the possessory rights of these miners as ascertained among themselves by the rules which have become the laws of the mining districts as regards mining claims. See Rev. St. tit. 32, c. 6, §§ 2318–2352. But in doing this it has not parted with the title to the land, except in cases where the land has been sold in accordance with the provisions of the law on that subject." Just here seems to be a good place to remark that, in the common parlance of the mining districts, the word "claim," used as a noun, has a definite and particular meaning, denoting, when coupled with the name of miner, a particular piece of ground to which that miner had a recognized vested and exclusive right of possession for the purpose of extracting precious metals therefrom, and there is reason to suppose that, in framing the reservation clause of this grant, congress selected the word "claims" for the express purpose of excluding from the grant lands held in possession of, and claimed by, miners according to local customs.

It is next insisted that the mineral claims referred to in the answer were not simply voidable, but absolutely void *ab initio*, because the land is in fact non-mineral, and in support of this it is said that as mineral lands are reserved from sale and entry, as agricultural lands, so non-mineral lands are unaffected by the mining laws, or the laws relating to entries of mineral lands, and the location and entry under mineral laws of non-mineral land is unauthorized, and a patent issued upon such an entry would be as void as a patent for mineral lands issued under a grant excluding such lands from its operation. This is very well, but we do not understand that a patent issued to a settler under the homestead or pre-emption laws would be void, or even voidable, by reason of the mere fact that the land conveyed contains valuable mines. The authorities cited certainly do not maintain that titles resting upon patents from the government can be vitiated by the discovery of minerals subsequently to the issuance thereof. In the case of *Mullan* v. *U. S.*, 118 U. S. 271, 6 Sup. Ct. Rep. 1041, the supreme court held that, as the entryman knew beforehand that the land contained a coal mine, he was guilty of misrepresentation and fraud in making the proofs upon which the patent was issued, and for that reason at the suit of the government it was canceled. In all the cases in which patents have been canceled, the courts have proceeded according to the familiar rules of equity, and the government has been required to allege and prove, by clear evidence, fraud, or some other sufficient equitable ground for wresting the property from the parties sued.

The last proposition affirmed by counsel for the plaintiff is this: The land, being in fact non-mineral, was by virtue of the sixth section of

plaintiff's charter, from the date of the filing of a plat of the general route of the road in the general land-office, reserved for the plaintiff's benefit, and no claim to it could be thereafter initiated whereby the plaintiff's right to it under its grant could be defeated. We yield full assent to the authorities holding that the sixth section of this charter creates a reserve of the odd-numbered sections within the limits defined from the time of the filing of a plat of the general route in the general land-office. But the reservation which this section makes is limited, and no greater effect should be given it than congress intended. This law does not purport to prohibit any person from going upon the land reserved from sale or entry or pre-emption for the purpose of hunting or fishing, nor prohibit cattle from grazing thereon, nor render unlawful a search for minerals, nor forbid the taking up of mining claims in such lands by persons supposing the same to contain the precious metals in sufficient quantities to pay for working. The country at large had an interest to be subserved by the early discovery of all the mines contained in lands liable to be claimed by the plaintiff under its grant; and it is folly to suppose that if congress had intented, contrary to the public interest, to prohibit the prospecting of a vast area of the public land through a region known to be rich in minerals, or to deprive prospectors of the right to claim and hold supposed discoveries until the truth regarding the same could be ascertained in the only practical way,—that is, by development,—requiring time, and involving labor and the outlay of money, it would not have positively said so in plain words. Of the multitude of authorities cited, the decisions of Mr. Justice FIELD and Judge DEADY in the case of *Denny* v. *Dodson*, 32 Fed. Rep. 899, and the case of *Buttz* v. *Railroad Co.*, 119 U. S. 55, 7 Sup. Ct. Rep. 100, are especially relied upon by the plaintiff's counsel. *Denny* v. *Dodson* was an action of ejectment by a vendee of the Northern Pacific Railroad Company. The complaint alleged that the demanded premises were portions of an odd-numbered section within the limits of the grant, fully earned by the company by a completion of that part of the road opposite thereto, and compliance on the part of the company with all requirements of the law, and that at the date of fixing the general route of the road said lands were public lands, not mineral, and not reserved, sold, granted, or occupied by homestead or other settlers, nor otherwise disposed of or located upon, and were free from pre-emption or other claims or rights, and to them the United States had full title, not appropriated otherwise than by the grant to said company. By the decision of the court a demurrer to said complaint was overruled. From the opinion of Mr. Justice FIELD, it appears that, after the fixing of the line of general route of the road, the land was settled upon, and at the time of the definite location of the line the same was occupied as a town-site; and upon the demurrer it was argued that the complaint was insufficient, for want of an allegation to the effect that at the latter date the lands were not claimed under the town-site law. The court held that, on account of the reservation by the sixth section of the plaintiffs' charter, no entry of the land under the town-site act could be made after the date of the filing of a plat of

the general route in the general land-office, and therefore such an allegation in the complaint was unnecessary. In *Buttz* v. *Railroad Co.*, the contention was regarding part of an odd-numbered section within the limits of the grant which had been settled upon while it remained part of the Indian country, not at the time open to settlement under the laws of the United States, because the Indian title had not been extinguished. It was the settler's intention at the time of commencing to occupy the land to acquire title to it under the pre-emption law, and within three months after the township plats of the government survey had been filed in the district land-office he offered to file his declaratory statement as a pre-emptor. The land was within the limits defined by an order of the secretary of the interior previously made, withdrawing the odd-numbered sections therein from pre-emption entries under the sixth section of the plaintiff's charter, and for that reason the filing of said declaratory statement was not permitted. The supreme court held, in effect, that a claim of a mere squatter, based upon nothing but an unlawful occupancy of lands, will not be taken notice of by the government for any purpose; that the offer to file a declaratory statement under the pre-emption law was properly rejected by the officers of the land department; and that the land was not excluded from the grant to the railroad company by reason of an unrecognized claim of a squatter, nor by reason of the fact that the right of occupancy of the Indians had not been completely extinguished at the time of the definite location of the road. These cases are not like the case at bar. It is clearly distinguishable from each of them by the important fact that the land in controversy was, at the time the grant ceased to be afloat, affected by something more than a mere pretended claim existing only in the mind of an individual. It was for the time being actually segregated from the body of the public domain, by claims apparently genuine and lawful, appearing of record and recognized by the officers of the government, and as to the actual validity thereof dependent only upon issues of fact to be thereafter determined by competent authorities. By an unbroken line of decisions of the supreme court, from the case of *Wilcox* v. *Jackson*, 13 Pet. 498, to the case of *St. Paul & P. R. Co.* v. *Northern Pac. R. Co.*, 139 U. S. 1, 11 Sup. Ct. Rep. 389, the title to land so affected does not pass by a grant of "public land." For the reasons above given it is the decision of this court that the judgment of the circuit court for the district of Montana in this case be affirmed.