**UNITED STATES v. CARBON COUNTY LAND CO. et al.**

**CARBON COUNTY LAND CO. v. UNITED STATES et al.**

Nos. 248, 253.

Circuit Court of Appeals, Tenth Circuit.

Jan. 14, 1931.

---

[1] No opinion filed in court below. Quotation is from decree.

Samuel A. King, of Salt Lake City, Utah (Creighton G. King, of Salt Lake City, Utah, on the brief), for Carbon County Land Co.

George P. Parker, Atty. Gen., of Utah, for the State of Utah.

Before LEWIS, COTTERAL, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

This is the fourth appearance in appellate courts of a controversy over 5,564.28 acres of coal land in Carbon county, Utah, the original litigation having been commenced on January 7, 1907. The earlier cases are Milner v. United States (C. C. A. 8) 228 F. 431, appeal dismissed, 248 U. S. 594, 39 S. Ct. 132, 63 L. Ed. 437; United States v. Carbon County Land Company (C. C. A. 8) 9 F.(2d) 517; certiorari granted and decision affirmed, Independent Coal & Coke Company et al. v. United States, 274 U. S. 640, 47 S. Ct. 714, 71 L. Ed. 1270. These opinions set out so fully the facts connected with the early history of the controversy that a sketch thereof will suffice for this opinion.

In the Act of July 16, 1894 (28 Stat. 109), which provided for statehood for Utah, there is a floating grant to the state of many thousands of acres of unappropriated public lands. Provision was made for the selection, from time to time, of the lands so granted, but mineral lands were not subject to selection by the state, and were not included in the grant. Section 2318, Rev. Stat. (30 USCA § 21); Independent Coal & Coke Company v. United States, 274 U. S. 640, 642, 47 S. Ct. 714, 71 L. Ed. 1270; Milner v. United States (C. C. A.) 228 F. 431, 439; Mullan v. United States, 118 U. S. 271, 276, 6 S. Ct. 1041, 30 L. Ed. 170; United States v. Sweet, 245 U. S. 563, 38 S. Ct. 193, 62 L. Ed. 473.

In 1896 the Legislature of Utah created a board of land commissioners and conferred upon it the control and management of such granted lands, and prescribed regulations for the selection and sale thereof. Laws of Utah 1896, c. 80. Pursuant thereto, and between 1900 and 1903, Stanley B. Milner and his relatives and associates applied to purchase the lands in controversy, describing them as "grazing lands" and agreeing to release the state from its obligation to sell "if the said land shall hereafter be determined to be mineral in character." These applications were accompanied by affidavits that the applicants were well acquainted with the lands, and that they were nonmineral. The state

Charles R. Hollingsworth, U. S. Atty., of Salt Lake City, Utah (Seth W. Richardson, Asst. Atty. Gen., and Nat M. Lacy, of Washington, D. C., on the brief), for the United States.

Mahlon E. Wilson, of Salt Lake City, Utah, for Independent Coal & Coke Co.

board relied upon the truthfulness of the affidavits, and its president and secretary made affidavit that the board had caused said lands to be examined, and that they were nonmineral. The state board then filed these documents with the local register and receiver of the United States Land Office at Salt Lake City, who certified that the lands were not listed on the survey as mineral lands; whereupon all papers were forwarded to the Commissioner of the General Land Office at Washington, and in reliance thereon the lands were certified to the state of Utah between 1901 and 1904. The agreement of the Milners to purchase then attached, under which the Milners had ten years to pay the purchase price, $1.50 an acre. The purchasers then assigned to the Carbon County Land Company, a corporation in which Stanley B. Milner owned 99.95 per cent. of the stock.

■ These lands were in fact underlain with valuable coal deposits, and are mineral lands within the statute. Mullan v. United States, 118 U. S. 271, 6 S. Ct. 1041, 30 L. Ed. 170. There was no exposure of commercially valuable coal on any subdivision of the lands selected; and until the decision in 1911 of United States v. Diamond Coal & Coke Company (C. C. A. 8) 191 F. 786, affirmed in 233 U. S. 236, 34 S. Ct. 507, 58 L. Ed. 936, many lawyers and some courts believed that such exposure was an essential to the listing of lands as mineral. A rule promulgated by the Commissioner of the General Land Office and decisions of the Land Office were to that effect. However, since the decision of the Diamond Coal & Coke Company Case, it is clear that the mineral character of land may be established by any satisfactory evidence, including geologic inference. The proof in the Milner Case, and in this case, leaves no doubt that the formation of the surrounding country, the outcroppings and development of contiguous territory, were such as to demonstrate the existence of valuable coal deposits under the lands involved, and that the Milners knew the facts indicating the presence of such minerals when they made their affidavits.

When these facts became known to the government, it brought an action, in 1907, against the Milners and their assignee, alleging that the lands were mineral in character and did not pass under the grant to the state; setting out that the certifications from the United States to the state had been procured by the fraudulent misrepresentations of the Milners; alleging that such certifications and all conveyances made thereunder were void, and that possession of the lands should be restored to the United States, and all clouds on the title of the United States should be removed. The bill prayed specifically for the cancellation and surrender of the Milner contracts, and for general relief.

The state of Utah was not made a party. The records of the state land board disclose that the day after this suit was filed Mr. Maynard, a special assistant to the Attorney General, appeared before the board and served upon it a copy of the bill of complaint, and stated that the bill only asked to set aside the Milner contracts and relieve the state from such contracts; that if the government won the suit, the title to the lands would be in the state; and that the government did not seek to deprive the state of its title. If these minutes correctly report Mr. Maynard's summary of the bill of complaint, he did not summarize accurately, for the bill alleges that the lands were mineral and were not granted to the state, that the certifications were procured by fraud and void, and that possession should be restored to the United States. He also read to the board the opinion in Williams v. United States, 138 U. S. 514, 11 S. Ct. 457, 34 L. Ed. 1026, in which a similar suit was brought to recover lands from purchasers from the state, where certification to the state had been procured by the fraud of the purchasers. There, as here, the state was not made a party, and it was argued that the state, the holder of the legal title, was a necessary party. But the Supreme Court held otherwise, and said, at page 516 of 138 U. S., 11 S. Ct. 457, 458: "The state of Nevada might have intervened. It did not; doubtless, because it felt it had no real interest. It was no intentional party to any wrong upon the general government. If its agency had been used by the wrongdoer to obtain title from the general government; if, conscious of no wrong on its part, it had obtained from the general government the legal title, and conveyed it away to the alleged wrong-doer, it might justly say that it had no interest in the controversy, and that it would leave to the determination of the courts the question of right between the government and the alleged wrong-doer, and conform its subsequent action to that determination. That, certainly, is the dignified and proper course to be pursued by a state which is charged to have been the innocent instrumentality and agent by which a title to real estate has been wrongfully obtained from the general government."

The Milner Case was tried in January, 1910. The evidence disclosed the mineral

character of the lands as above set out, thus presenting the same legal question as the Diamond Coal & Coke Company Case, then on appeal; the trial court therefore awaited the decision in that case. When that case settled the law, the trial court in June, 1914, decreed the United States to be the "owner and entitled to the possession" of the lands involved, quieted its title against defendants and all claiming under them, decreed that defendants had no title or right to possession to any part of the property, and perpetually enjoined them from asserting any claim thereto.

This decree was affirmed in Milner v. United States (C. C. A. 8) 228 F. 431, 439, the Court of Appeals concluding its opinion by holding: "We find that the whole transaction was a scheme or conspiracy on the part of Milner to fraudulently obtain the ownership of these lands from the United States."

An appeal was taken to the Supreme Court of the United States, and dismissed for want of prosecution. 248 U. S. 594, 39 S. Ct. 132, 63 L. Ed. 437.

There was no further certification by the United States; the state of Utah was advised of the proceedings above related; yet in 1920, basing its right so to do upon the certifications determined to have been fraudulently secured, the state of Utah patented these lands to the Carbon County Land Company, the same corporation, with some change in stock ownership, which had been found to be privy to the original fraud, and which had been enjoined from ever asserting any claim to these lands. The patent recites a consideration of $556,428, and is unconditional. The patentee paid this consideration by executing its notes for the full purchase price, $100,000 due in 10 years, $200,000 in 20 years, and the balance in 30 years. The notes bore no interest for five years from their date; thereafter bore 5 per cent. interest. The notes are secured by a mortgage on the lands so patented.

The Carbon County Land Company sold 1,120 acres of the land to the Independent Coal & Coke Company, in October, 1920, in consideration of approximately $365,000 par value of the stock of the latter company, and the assumption of $112,000 of the indebtedness to the state of Utah. Between 1920 and 1924 the Independent Company paid $40,000 in taxes to the state. The Independent Company was not a participant in the fraud found in the Milner Case, but was fully advised of all the proceedings in court in the

Milner Case. Counsel for the Independent Company advised it that while the government could have successfully assailed the state's title on the record in the Milner Case if the action had been brought within six years after certification, the Act of March 3, 1891, had barred that right. Counsel did, however, advise the Independent Company that, should they determine to purchase this land, "they must take the chances of an adverse answer to these questions, which in my judgment are quite remote." The Carbon County Land Company and the Independent Company have been in possession since 1920.

On May 16, 1924, this action was brought against the Carbon County Land Company and the Independent Coal & Coke Company. The original bill is not in the record, but from the opinions of the courts, it appears that the decree of June 8, 1914, in the Milner Case was set out, together with the 1920 patent and the conveyance to the Independent Company. The prayer was that the defendants be adjudged to hold whatever title they had in trust for the United States, and to convey same to the United States, and deliver up any muniments of title, and that defendants be enjoined from removing any coal from the land and from intermeddling therewith. The trial court dismissed the bill on the ground that relief was barred by the statute of limitations. Act March 3, 1891 (26 Stat. 1095). Upon appeal, this ruling was reversed, United States v. Carbon County Land Company (C. C. A. 8) 9 F.(2d) 517, 519, the court holding that the bill was not one to cancel a patent or certificate, but was in the nature of a supplemental bill to obtain the benefits of the former decree. The state of Utah was not a party, but the court spoke of the state "as a mere conduit through which the lands were to be fraudulently acquired." The court held that, "if the case stated in the bill should be made out, it would seem clear that the relief sought should be granted—as to Carbon County Land Company, that it convey to appellant all of the lands title to which stood in its name when this suit was brought, and deliver to appellant any patent or other conveyance to it from the State; as to Independent Coal & Coke Company, that it make like conveyance of any of the lands conveyed to it, in which it acquired an interest with notice of appellant's rights, or without value."

The Supreme Court granted certiorari, the state of Utah appearing amicus curiæ in support of the writ and in opposition to the United States. The decision of the Eighth Circuit Court of Appeals, 9 F.(2d) 517, was

affirmed. Independent Coal & Coke Company v. United States, 274 U. S. 640, 47 S. Ct. 714, 71 L. Ed. 1270. Referring to the decree in the Milner suit, the Supreme Court said, at page 646 of 274 U. S., 47 S. Ct. 714, 717: "The decree in that suit is conclusive that the company was a party to the fraudulent scheme or conspiracy to acquire title to the public lands by using the state and its officials as agencies to procure the transfer. The decree not only established that the United States was the true and full owner of the land to the exclusion of the defendants, but perpetually enjoined them from setting up or making any claim to the lands. This and the issues of fact there resolved in favor of the United States, and pleaded here, lead to the conclusion that none of the defendants, nor any claiming under them with notice, could by any legal device, however ingenious, acquire title from the state free from the taint of their fraud."

The court held that, by the earlier decree, the United States was the owner of whatever rights the Milners acquired under their contracts with the state, and that the Milners could not effectively surrender those rights to the state "unless the state stood in the position of a purchaser for value without notice." The court held that the Independent Company took subject to the equities of the United States and to the equities against the Carbon County Land Company, unless it affirmatively proved that it was a purchaser in good faith without notice.

When the case came back to the District Court, the bill was amended in form; the prayer is that the defendants be decreed to hold title in trust for the United States, that they be enjoined from trespassing on or removing coal from the property, and for any other relief to which plaintiff is entitled under the facts. The defendants answered, denying that the lands were mineral lands; denying that the decree of 1914 was binding on the state of Utah; alleging that the state had an unassailable title in 1920, through which defendants in good faith deraign their title. The Independent Company set out its payments for the land, for improvements, and for taxes, and alleged that the United States is estopped now to challenge the title. Laches and limitations were also pleaded.

The state of Utah intervened, alleging that it was innocent of any wrong, and was without knowledge of the fraud of the Milners when the certifications from the government were originally procured; that the Milner decree was not binding on it; that the

government was estopped by the representations of the Assistant Attorney General to the Land Board; that the government was barred by the statute of limitations from attacking its certifications. It sets up its mortgage on the lands, and prays that its title be quieted as against the United States, that its mortgage be decreed to be a binding obligation, and that the court decree that the lands have been subject to taxes since 1920. Replications were filed, admitting that the state had acted innocently in procuring the certifications in the first instance, but that, when it undertook to sell the lands in 1920, it did so with full knowledge that the land was mineral and not subject to grant, and that the certifications had been procured by active misrepresentations. The government also filed an answer to the complaint in intervention of the state, in which the entire history of the certifications was pleaded, much as in the original bill of complaint filed in 1907 against the Milners, and praying affirmatively that the title of the state be decreed to inure to the government; that its mortgage and all liens for taxes be canceled, and that the government's title be quieted as against the state; that, in the alternative, the certifications be canceled, and for all other proper relief.

There was a trial, at which some of the evidence in the Milner Case was reintroduced, together with additional testimony on both sides of the question of whether this land was known mineral land when certified. The Carbon County Land Company and its grantees are bound by the adjudication of the facts in the Milner Case. We are of the opinion that the state of Utah is so bound; but, if it were not, there is evidence in this case that the lands are mineral. The trial court made no finding thereon, but we have reviewed the evidence and it develops substantially the same facts reviewed by the Court of Appeals in the Milner Case. We are in accord with the findings there made, and we find on this record that these lands were in fact mineral lands and not subject to grant, and that the Milners knew the facts; although the president and secretary of the state board made affidavit that the lands were nonmineral, it appears they did not in fact know they were, and the government admits in its pleadings that the state was an innocent instrumentality through which the Milners wrongfully procured these certifications.

The trial court entered a decree (1) that the state of Utah is, as against the United States, the owner of the lands in controversy; and (2) quieting the state's title as against the United States; and (3) that the 1920

patent to the Carbon County Land Company is void; and (4) that the decree determines no rights between the state and the Independent Coal & Coke Company. The United States appeals from the decree as a whole; the Carbon County Land Company appeals from that part of the decree adjudging the 1920 patent to be void.

For a great many years it has been the policy of the government to exclude mineral lands from ordinary entry. The grant for school purposes to the state of California, made in 1853, was held to exclude coal lands. Ivanhoe Mining Company v. Consolidated Mining Company, 102 U. S. 167, 26 L. Ed. 126. The Act of July 1, 1864 (13 Stat. 343), made provision for the sale of coal lands at a price of not less than $20 an acre. See, also, Act of March 3, 1873 (17 Stat. 607 [30 USCA §§ 71–76]). The Act of September 4, 1841 (5 Stat. 453), prohibited pre-emption of lands on which are situated "any known salines or mines." These early acts have been amended from time to time, but their legislative history leaves no doubt of adherence, for nearly a hundred years, to the policy of excluding known mineral lands from such general grants as was made to the state of Utah.

That the lands here involved were known mineral lands, and not subject to grant, has been proven in two trials, one in 1910 and again in 1929. That they are in fact coal lands is further attested by the sale by the state in 1920 for $100 an acre, and the sale of 1,120 acres to the Independent Company at a price of approximately $400 an acre. That title thereto was procured from the government by material misrepresentations of facts has been twice proven and once adjudicated. The government attacked the proceedings by which its certifications were procured by a proceeding in a court of competent jurisdiction within the six years prescribed by section 8 of the Act of March 3, 1891 (26 Stat. 1099 [43 USCA § 1166]). A final decree that the government is the owner of these lands, stands. The lower court decreed that the government did not own them; that its title had been lost by virtue of the limitation contained in the Act of March 3, 1891.

It has been conclusively determined, in the prior appeals of this particular case, that the six years' limitation is not a bar to this action as far as it seeks to impress a trust on the titles of the Carbon County Land Company and the Independent Coal & Coke Company. Both the Court of Appeals and the Supreme Court have held that, if the allegations of the bill were proven, the government was entitled to the relief sought as to these defendants, unless an affirmative defense was established. The allegations have been proven; no affirmative defense has been established. The Carbon County Land Company could not possibly claim to be a purchaser in good faith, and the Independent Company knew all of the facts when it purchased, and assumed the risk as it was advised by its counsel that it must. The two companies hold the legal title to these lands. The Supreme Court, on the prior appeal, held in clear language that the government, upon proof of its averments and absent an affirmative defense, was equitably entitled to such title and to a transfer thereof to the government. These rights against the companies cannot be denied because the state intervened to protect its mortgage interest. Nor would it avail the defendant companies if the title of the state had been unassailable prior to the 1920 patent. The state no longer holds the title; the title is held by the Carbon County Land Company and its assignee, and the Carbon County Land Company was the original wrongdoer. This same argument met with a decisive answer by the Supreme Court on the prior appeal. Among other things the court said: "So here the obligation, having its inception in the fraud which was established in the first suit, has been confirmed by the decree and persists as to every interest acquired by petitioners under the contracts with the state or which may be enjoyed by them as the fruit of their fraud, even though we assume for the moment that the title acquired by them could not have been challenged while in the hands of the state. * * * Even if the title acquired were through a new and independent contract and even though it were not in a strict sense proceeds of the earlier contracts, the relation of the land company and its equitable obligation to the government, and its duty under the decree in the first suit, are such as to preclude the acquisition of any outstanding interest in the land in violation of the decree, free of that obligation and duty." Independent Coal & Coke Company v. United States, 274 U. S. 640, 648–649, 47 S. Ct. 714, 717, 71 L. Ed. 1270.

The government was not awarded the relief sought, and to which it was entitled, as to the two companies. Instead no adjudication was made as to the Independent Company; and, as to the Carbon County Land Company, relief was granted that was not asked, and which was no relief at all as to the

government. The denial of relief as to these two companies is contrary to the decision of the Supreme Court of the United States on the prior appeal, renders nugatory the decree of 1914, and is erroneous.

■ The state intervened, and prays that its mortgage be adjudged a lien on the lands. It asserts that it was not a party to the Milner suit, and it was not; it concludes that it is not bound by the decree therein. But the conclusion does not follow. The state has parted with the title; the interest it now claims is a mortgage, taken from the Carbon County Land Company. As such mortgagee, it holds under that company; it cannot assert that it acquired its mortgage without knowledge of the infirmity of its grantor's title, and is not therefore entitled to the protection afforded a bona fide purchaser; as a privy in title, it is bound by the decree under familiar rules.

■ The argument for the state is predicated upon the assumption that it is an ancestor in title to the Carbon County Land Company, rather than a privy. It is doubtful if this is a fair assumption, since the state has seen fit, for purposes of its own, to part with its title unconditionally, and take back a mortgage. But, assuming that the holder of a purchase-money mortgage has the same rights as one who has retained the title and merely contracted to sell, we come to the same conclusion. The government did not join the state, which then was innocent of intentional wrong, as a party defendant in the Milner Case, but followed the procedure approved in Williams v. United States, 138 U. S. 514, 11 S. Ct. 457, 34 L. Ed. 1026. But it did serve upon the state, through its land board, a copy of the bill of complaint the day after it was filed. That bill alleged the facts as to the misrepresentation, and further "that all of the aforesaid certified selections of the aforesaid lands should be declared null and void and of no effect, and all the conveyances by which any of the defendants claim right of possession or title to said lands herein described, should be set aside and held for naught, and complainant should be fully restored to the possession of said lands, and all clouds upon the title removed therefrom." It was also cited to the decision of the Supreme Court in the Williams Case, which held that a state, in similar situation, might intervene, or pursue the more dignified course of disclaiming any interest in the controversy and conforming its subsequent conduct to the decree of the court. The state of Utah followed neither course;

it did not intervene; neither did it conform. It is therefore our conclusion that, under the peculiar circumstances of this case and under the doctrine of the Williams Case, the state is bound, in equity, by the decree of 1914.

■ The limitation of the Act of March 3, 1891, no more applies to the state of Utah than to the defendant companies. The action here is not to cancel a patent nor a certification. Although an alternative prayer of cancellation is contained in the government's cross-bill against the state, the primary relief sought against the state is the same as that against the companies—to impress a trust on such title as it has in aid of the 1914 decree. That statute does not therefore bar this action.

That the state has no just claim to these lands is clear. It is in no sense a purchaser for value. It was an innocent conduit through which wrongdoers procured certifications by misrepresentation of facts. Mineral lands were not granted to the state. It is true that these 5,564.28 acres stand charged to Utah, but the charge is easily removed, and nonmineral lands can be selected in lieu thereof. As a matter of fact, the state's position in this case is not entirely worthy of it. Asserting its own innocence, it seeks now to appropriate the benefits of the misrepresentation of others, and to secure valuable land which was not granted to it.

■ The law is clear that this cannot be done. One who is not an innocent purchaser for value, and who asserts a claim to property which it knows to have been procured by fraud, is as responsible as the original wrongdoer. In McIntire v. Pryor, 173 U. S. 38, 52, 19 S. Ct. 352, 357, 43 L. Ed. 606, the court held: "But, whatever was done by Martha McIntire to this property, whatever title she acquired, was through the agency of her brother, and she is as chargeable with his frauds as if she had committed them personally. United States v. State Bank, 96 U. S. 30 [24 L. Ed. 647]; Griswold v. Haven, 25 N. Y. 595 [82 Am. Dec. 380]; Reynolds v. Witte, 13 S. C. 5 [36 Am. Rep. 678]."

Mechem, in his work on Agency (2d Ed.) § 1993, states: "But even though it should be held that the representations were ones which the agent was neither expressly nor by implication authorized to make, the principal may nevertheless be charged with responsibility for them if, after knowledge of their making, he voluntarily seeks to enforce or to gain or retain benefits flowing from the act or contract which was induced by such representation. The principal, in

such a case, when he learns of the unauthorized representations, may disaffirm the transaction and escape liability. But if he voluntarily takes the benefits of the act or contract, he must ordinarily assume responsibility for the instrumentalities by which it was brought about."

And Williston, in his work on Contracts (section 1518), states that a person defrauded may be granted relief against an innocent third person, "where, though the misrepresentations were not made by one acting as agent of the party benefited, the latter was or should have been cognizant of them, or was the cause of their being made, or gave no value for what he received, or gave no value until after he had learned of the misrepresentations."

To the same effect, see Goldsmith v. Koopman (C. C. A. 2) 152 F. 173; 27 C. J. 12.

 When the state issued its patent in 1920, it asserted its title to these lands. It knew that the title had come to it by virtue of the misrepresentations of fact made by the Milners, and knew that such fact had been fully adjudicated; it had innocently vouched for those misrepresentations, and was the instrumentality without which the misrepresentations would have been of no avail; it parted with no value, and is not entitled now to reap the benefits of the wrong done the government. The District Court has jurisdiction, concurrent with that of the Supreme Court, over controversies between a state and the United States. Ames v. Kansas, 111 U. S. 449, 4 S. Ct. 437, 28 L. Ed. 482. The state has submitted to the jurisdiction of the court by intervention. Without passing on the mooted question of whether the Act of March 3, 1891, applies to certifications, we hold, on the authority of Independent Coal & Coke Company v. United States, supra, that such statute does not bar an action brought to impress a trust in aid of a decree vesting title to the lands in the United States, and that the government is entitled to such relief against the intervener.

Counsel argue that the 1914 decree does no more than set aside the contracts of sale made to the Milners; that such was the sole purpose of that suit, and, if the decree purports to do more, it is not responsive to the pleadings and is of no effect. If this is true, the Carbon County Land Company was free to buy this land again from the state, the day after the decree was entered, upon any terms. But it is not true; the decree speaks for itself, and is not open to collateral attack. Furthermore, it is responsive to the bill. As has been seen, the bill of complaint in the original case was primarily directed at the fraud by which the certifications were procured; and the decree, by adjudging the government to be the owner of the lands, found that the certifications had been procured by fraud. The injunction is not against any claim of the defendants under their then existing contracts, but is against them asserting any claim under the certifications which they had fraudulently procured.

 It is argued that the United States is estopped to assert title to these lands by the conversation had between the special assistant to the Attorney General and the Land Board of Utah, in 1907. While this conversation does not impress us as attempting to modify the bill of complaint which was the subject of the talk, it must be clear that no power resided in a special assistant to the Attorney General to convey reserved mineral lands to the state of Utah. Nor can it be said that estoppel arises because such conversation induced the state not to intervene; on the record in the Milner Case and in this case, intervention would have availed the state nothing, and no detriment therefore resulted to the state. Furthermore, Congress has prescribed the method of disposing of mineral lands, and has reserved them from general grants. No employee of the United States has power to permit what Congress has forbidden.

"* * * The United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit. Lee v. Munroe, 7 Cranch, 366, 3 L. Ed. 373; Filor v. United States, 9 Wall. 45, 49, 19 L. Ed. 549, 551; Hart v. United States, 95 U. S. 316, 24 L. Ed. 479; Pine River Logging Co. v. United States, 186 U. S. 279, 291, 22 S. Ct. 920, 46 L. Ed. 1164, 1170." Utah Power & Light Co. v. United States, 243 U. S. 389, 409, 37 S. Ct. 387, 391, 61 L. Ed. 791.

 Nor is there room for the application of the doctrine of laches; laches is not imputable to the government in a suit maintained to enforce its policy respecting public lands. Causey v. United States, 240 U. S. 399, 36 S. Ct. 365, 60 L. Ed. 711; Utah Power & Light Co. v. United States, supra. Moreover, there appeared to be no reason for the United States to act until Utah asserted its claim to these lands by issuing a patent.

Counsel argue that the Milners were not guilty of actual fraud; that at most they misconstrued the law and the regulations. This

988

may very well be true, and we have no disposition to impute to them any moral turpitude. But the fact remains that it has been adjudicated that, in a legal sense, they fraudulently obtained these lands from the United States. Counsel urge again the propositions which were advanced in the Diamond Coal & Coke Company, the Milner, and the Carbon Company Cases. But these decisions are binding upon this court.

The decree is reversed, with instructions to enter a decree in conformity with this opinion, including therein that the titles held by the Carbon County Land Company and the Independent Coal & Coke Company and the state are impressed with a trust in favor of the United States; that the defendant companies convey to the United States the titles which stood in their names when this suit was brought, failing which the decree should operate as such conveyance; the decree should operate as a cancellation of the lien of the mortgage held by the state and of any tax deeds or liens thereon; the title of the United States should be quieted; the defendants and the intervener, or any one claiming under them, should be enjoined from asserting any claim to the title or possession of the premises; it should provide for an accounting by the defendant companies for the use of the lands since 1920; if upon that accounting there is a charge made to the Independent Coal & Coke Company for the value of any coal recovered, there should be credited against that charge the reasonable cost of the mining thereof, since that company did not participate in the original wrong and acted in good faith and upon the advice of reputable counsel. The costs on the appeal in No. 248 are taxed to the defendant companies; in appeal No. 253 to the Carbon County Land Company.

Reversed and remanded, with instructions.