## MORTON v. NEBRASKA.

1. The policy of the government, since the acquisition of the Northwest Territory and the inauguration of our land system, to reserve salt springs from sale, has been uniform. This policy has been applied to the "Louisiana Territory," acquired by us from France in 1803, and probably would apply to the Territory of Nebraska, on general principles. Whether or not, it does apply under the act of July 22d, 1854, "to establish the offices of surveyor-general of New Mexico, Kansas, and Nebraska." It applies at least so far as to render void an entry where the salines at the time had been noted on the field-books, were palpable to the eye, and were not first discovered after entry.

2. Patents for land which have been previously reserved from sale are void.

3. Where an act of Congress speaks of "vested rights," protecting them, it means rights lawfully vested. Hence, it does not protect a location made on public land reserved from sale.

ERROR to the Supreme Court of Nebraska.

Morton sued certain tenants of the State of Nebraska in ejectment to recover three hundred and twenty acres of salt land—*salines*—in the said State; a State formed, as every reader of these volumes is aware, out of that vast region formerly known as the Territory of Louisiana and purchased in 1803 by us from France. The land in question was palpably saline, so incrusted with salt as to resemble snow-covered lakes. The salines in question were noted on the field-books, but these notes were not transferred to the register's general plats. The State intervened in the suit, and by its own request was made a defendant.

The plaintiff based his title under locations of military bounty-land warrants at the land office in Nebraska City, in September, 1859. These warrants were issued by virtue of the Military Bounty-Land Act of September 28th, 1850, which declared that such warrants might be located at any land office of the United States upon any of the public lands in such district *then subject to private entry*. The locators of the warrants, it appeared, before they made their entries, were told that the lands were salines. The State now set up that the locations were without authority of law, be-

cause the lands being saline lands were not subject to such entry.

The question thus was whether, in Nebraska, saline lands were open to private entry; or more strictly, whether they were so under circumstances such as those above stated.

It was not denied by the plaintiff that the practice of the Federal government, as exhibited by many acts of Congress (which being referred to in the opinion of the court, need not here, by the reporter, be particularized), from an early date had been to exclude this sort of land, with certain other sorts, from public sale, generally. It had done so confessedly from the Northwestern Territory and from the Territory of Orleans, the now State of Louisiana. But the defendants conceived—and such was their position—that under the statutes regulating the matter in *Nebraska* this was not so.

The matter was to be settled by certain acts of Congress, standing perhaps by themselves; or if their language was not clearly enough applicable to the district of Nebraska, by such acts, read by the light of the policy of the government and its numerous enactments on the main subject.

The first act which bore directly upon the matter was an act of March 3d, 1811,* "providing for the final adjustment of claims to lands and for the sale of the public lands in the Territories of Orleans and Louisiana." This act created a new land district, and authorized the President to sell any surveyed public lands in the Territory of Louisiana, with certain exceptions named;

"And with the exception also of the *salt springs* and lead mines, and lands contiguous thereto."

Next came an act, approved July 22d, 1854,† more immediately bearing on the matter: "An act to establish the offices of surveyor-general of New Mexico, Kansas, and *Nebraska*, to grant donations to actual settlers therein, and for other purposes."

This was an act of thirteen sections, and, as its title shows, relating to three different Territories.

---

* 2 Stat. at Large, 665, § 10.    † 10 Id. 308.

The first three sections related, without any question, exclusively to the Territory of New Mexico.

The first of them authorized the appointment of a surveyor-general for *that* Territory, with the usual powers and obligations of such officers.

· The second made a donation of a quarter-section of land to all white males residing in *it*, who had declared an intention, prior to January 1st, 1853, to become citizens; and also (on condition of actual settlement, &c.) to every white male citizen above twenty-one years of age who should remove or have removed there between January 1st, 1853, and January 1st, 1858.

⠂ The third authorized a patent for *such* land to issue.

⠄ Then came in a fourth section, in these words:

"*None of the provisions of this act* shall extend to mineral or *school* lands, *salines*, military or other reservations, or lands settled on or occupied for purposes of trade and commerce, and not for agriculture."

This fourth section, as the reader will observe, does not in terms refer to the Territory of New Mexico, but says *none of the provisions of this act*, &c.

However, the fifth section enacts "that sections 16 and 36 in each township, shall be, and the same are hereby reserved for the purpose of being applied to schools in the *said Territory;*" that is to say, the Territory of New Mexico; and the sixth reserves a quantity of land equal to two townships, for a university *there.*

The fourth section, therefore, as the reader will have noted, is interposited between sections which relate exclusively to the Territory of New Mexico; though it, itself, does not in terms so exclusively relate. The fifth section also, as he will have noted, makes a reservation for schools; a matter which the fourth section in some way apparently had also legislated upon.

⠄ Then came a seventh section, enacting "that any of the lands not taken under the provisions of this act" are subject to the operation of the Pre-emption Act of 4th September,

1841* [an act which by its tenth section authorizes certain persons to enter one hundred and sixty acres at the minimum price, and enacts—

"That no lands on which are situated any *known* salines or mines shall be liable to entry under and by virtue of the provisions of this act."]

Section eight authorizes the surveyor-general to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico; and lands covered thereby are to be reserved from sale.

Section nine gives the Secretary of the Interior power to "issue all needful rules and regulations for fully carrying into effect *the several provisions of this act.*"

Then comes, for the first time, in a section ten, a *specific* reference to Nebraska. This tenth section authorizes the appointment of surveyors-general for Nebraska and Kansas, with the usual powers and obligations of such officers. It authorizes them to locate their offices at certain places, &c.

The eleventh section directs surveys in the said Territories.

The twelfth subjects "all the lands to which the Indian title has been or shall be extinguished within said Territories of Kansas and Nebraska to the operations of the Pre-emption Act of 4th September, 1841;" the Pre-emption Act mentioned above in the seventh section. And the thirteenth makes two new land districts, authorizes for these two districts the appointment of registers and receivers, and concludes the statute with an enactment thus:

"And the President is hereby authorized to cause the surveyed lands to be exposed to sale, from time to time, *in the same manner* and upon the same terms *as the other public lands of the United States.*"

Whether, therefore, this section four, interposited as it is between sections relating exclusively to New Mexico, did,

---

* 5 Stat. at Large, 456.

notwithstanding its general language, bear on the Territory of Nebraska, was one question raised by the plaintiff in the case, who denied that it did or could. He asserted that it meant " none of the *foregoing* provisions," &c.; that is to say, the provisions in section two about the *donation* of land.

The State, on the other hand, insisting that it did apply to the other two Territories mentioned in subsequent sections of the act, asserted also that whether it did or did not was unimportant, since by the twelfth section the lands in Nebraska were subjected to the provisions of the Pre-emption Act of 1841, which exempted " all *known* salines;" within which class, as it happened, those in question came.

The State, however, relied also on two other acts subsequent to that already set forth, of July 22d, 1854. The acts were thus:

1st. An act of the 3d of March, 1857,* " to establish three additional land districts in the Territory of Nebraska."

This act rearranged the land districts of Nebraska, authorized the appointment of officers for them, and by one section enacted—

" That the President is hereby authorized to cause the public lands in said districts to—with the exception of such as *may have been or may be reserved for other purposes*—be exposed to sale in the same manner as other public lands of the United States."

2d. An act of the 19th of April, 1864,† " to enable the people of Nebraska to form a constitution and State government, and for the admission of such State into the Union," &c.

This act enacts—

" Section 11. That all salt springs within said State, not exceeding twelve in number, with six sections of land adjoining, or as contiguous as may be to each, shall be granted to said State for its use; the said land to be selected by the governor thereof," &c.

Under this act (after the admission of Nebraska as a State

---

* 11 Stat. at Large, 186.          † 13 Id. 47.

into the Union), its governor made a selection of twelve salt springs, the ones now in question being of the number.

This act, however, contained a proviso which the plaintiffs conceived covered the present case and destroyed the value to the State (if it had any) of the main enactment. The proviso was thus:

"*Provided* that no salt spring or lands, the right whereof is now vested in any individual or individuals, shall by this act be granted to said State."

It may here be remarked that the plaintiffs had obtained certificates of entry for the lands in controversy, and patents for them had been issued. The patents were transmitted from the General Land Office at Washington to the local office in Nebraska. Before their delivery, however, the Commissioner of the General Land Office, ascertaining that the lands patented were saline lands and not agricultural, recalled the patents and cancelled the location.

The court below gave judgment for the State. From that judgment the other side brought the case here.

*The case was thoroughly well argued by Mr. Montgomery Blair, for the plaintiff in error, and by Messrs. William Lawrence, of Ohio, R. H. Bradford, and E. R. Hoar, contra, for the State or its tenants.*

In behalf of the plaintiffs in error (plaintiffs also below), it was argued that the act of July 22d, 1854, though purporting to be one statute, and in form such, was obviously in fact two statutes; the first statute coming to the tenth section and relating exclusively to New Mexico; the other, running from the beginning of that tenth section to the end of the thirteenth, and relating exclusively to Kansas and Nebraska. The case was the case of two separate bills referring to distinct but cognate subjects tacked together, and passed through Congress as one statute; a very familiar case in the legislation of Congress, or of one bill where two cognate and distinct subjects were acted on in one bill; one subject in the first part and the other in the last. Viewing

the statute in this light, the fourth section of the first act could not be made to overlap and cover any portion of the second act.

But if this were not the obvious history or character of the statute, the language of the fourth section is not the language of " reservation." The word " reserved " or " reservation" does not occur in it. The section was, therefore, to be confined to operating upon what immediately precedes it; that is to say, it was to be read as a prohibition upon the occupancy of the mineral, saline, and school lands of New Mexico, by settlers under the donation clause of the act contained in sections two and three preceding. New Mexico in 1854 was a distant, and agriculturally considered, a sterile Territory; though one having very rich mines and salines. The object of Congress was to invite *agricultural* settlers into it. Donations of agricultural lands to such persons were requisite to secure this object; and even such donations hardly secured it. But donations of the invaluable mineral lands and salines there were not at all requisite to invite thither the enterprising miner and salt-maker. These persons would go there if they could purchase at private sale or lease the mines or salines. Congress, therefore, would have been without excuse in giving away *these* mines and salines.

The fourth section is, therefore, not to be regarded as a reservation at all, but as a provision withdrawing mines, salines, and the other sorts of land named in it, from the operation of the donation clauses preceding it.

Any other construction of the section makes the statute tautologous. The section, it will be noted, operates, in whatever way it does operate, on *school* lands as much as on salines. If it is to be taken as a reservation, operating over subsequent parts of the act—a reservation, generally, on school lands—then as to New Mexico it makes the identical enactment which is made in the fifth section. This, as to that act, is a *reductio ad absurdum.* While a similar sort of demonstration appears in regard to the Territories of Nebraska and Kansas, when you advert to the fact revealed by

a reference to the statute-book, that a previous act,* the act of *May 30th*, 1854, " to organize the Territories of Nebraska and Kansas," by sections sixteen and thirty-four, reserves school lands in almost identical language for *them.*†

The learned counsel argued further, that the proviso in the eleventh section of the act of April 11th, 1864, was a plain recognition of a vested right—one made by its own patent—in the plaintiff.

They argued also that there having been no exhibition or evidence of salines apparent in the receiver's general plats, no knowledge of any was properly fixed on the plaintiff, and that the patents having once passed the seals of the General Land Office at Washington, the subsequent revocation was void. The plaintiffs were thus possessed of a legal title, and had a right to recover in ejectment.

Mr. Justice DAVIS delivered the opinion of the court.

The policy of the government since the acquisition of the Northwest Territory and the inauguration of our land system, to reserve salt springs from sale, has been uniform. The act of 18th May, 1796,‡ the first to authorize a sale of the domain ceded by Virginia, is the basis of our present rectangular system of surveys. That act required every surveyor to note in his field-book the true situation of all mines, salt licks, and salt springs; and reserves for the future disposal of the United States a well-known salt spring on the Scioto River, and every other salt spring which should be discovered.

These reservations were continued by the act of May 10th, 1800,§ which created land districts in Ohio, with registers and receivers, and authorized sales by them; the preceding act having recognized the governor of the Northwest Terri-

---

* 10 Stat. at Large, 283, 289.

† The language is, in the case of each Territory :

"Sections numbered 16 and 36 in each township in said Territory, shall be and the same are hereby reserved for the purpose of being applied to schools in said Territory."

‡ 1 Stat. at Large, 464.                    § 2 Id. 73.

tory and the Secretary of the Treasury as the agents for the sale of the lands. And the same policy was observed when provision was made in 1804 for the disposal of the lands in the Indiana Territory (embracing what is now Illinois and Indiana).* It was then declared "that the several salt springs within said Territory, with as many contiguous sections to each as shall be deemed necessary by the President, shall be reserved for the further disposal of the United States." Without referring particularly to the different acts of Congress on the subject, it is enough to say that all the salines in the Virginia cession were reserved from sale and afterwards granted to the several States embraced in the ceded Territory. Congress, in the disposition of the public lands in the Mississippi Territory,† and in the Louisiana purchase, preserved the policy which it had applied to the country obtained from Virginia. Over all the territory acquired from France the general land system was extended. The same rules which were prescribed by law for the survey and sale of lands east of the Mississippi River were transferred to this new acquisition.‡ At the first sale of lands in this region which the President was authorized to make, salt springs and lands contiguous thereto were excepted.§ And this exception was continued when, in 1811, a new land district was created. Prior to this time no portion of the country north of the State of Louisiana had been brought into market. The act of March 3d, 1811, authorized this to be done, but the President, in offering the lands for sale, was directed to except salt springs, lead mines, and lands contiguous thereto, which were reserved for the future disposal of the States to be carved out of this immense territory, which included the present State of Nebraska.|| And so particular was Congress not to depart from this policy, that in giving lands, in 1815, to the sufferers by the New Madrid earthquake, every lead mine and salt spring were excluded from location. Indeed, in all the acts creating new land districts in the territory now occupied by the States of Arkansas and

---

* 2 Stat. at Large, 277.      † Ib. 548; 3 Id. 489.

‡ 2 Id. 324.      § Ib. 391.      || Ib. 665, § 10

Missouri, the manner of selling the public lands is not changed, nor is a sale of salines in any instance authorized. On the contrary, they incorporate the same reservations and exceptions which are contained in the act of March 3d, 1811. In all of them the act of 18th May, 1796, is the rule of conduct for all surveyors-general and their deputies, as the act of 10th May, 1800, is the rule for all registers, requiring them to exclude from sale all salt springs, with the sections containing them.

In this state of the law of saline reservations, the act of 22d July, 1854, was passed. It is by no means certain that the act of March 3d, 1811, did not work the reservation of every saline in the Louisiana purchase, but without discussing this point, it is enough to say that the act of 1854 leaves no doubt of the intention of Congress to extend to the territory embraced by the States of Kansas and Nebraska the same system that had been applied to the rest of the Louisiana purchase. There was certainly no reason why a long-established policy, which had permeated the land system of the country, should be abandoned. On the contrary, there was every inducement to continue for the benefit of the States thereafter to be organized the policy which had prevailed since the first settlement of the Northwestern Territory. In the admission of Ohio and other States, Congress had made liberal grants of land, including the salt springs. This it was enabled to do by reserving these springs from sale. Without this reservation it is plain to be seen there would have been no springs to give away, for every valuable saline deposit would have been purchased as soon as it was offered for sale. An intention to abandon a policy which had secured to the States admitted before 1854 donations of great value, cannot be imputed to Congress unless the law on the subject admits of no other construction.

But the law of 1854,* instead of manifesting an intention to abandon this policy, shows a purpose to continue it. It was the first law under which lands were surveyed in Ne

* 10 Stat. at Large, 308.

braska, offered at public sale, and so made subject to private sale by entry. By it surveyors-general for New Mexico, and for Kansas and Nebraska, were appointed, with the usual powers and duties of such officers. And although there are provisions relating to New Mexico applicable to that Territory alone, yet the leading purpose of this act was to bring into market, as soon as practicable, the lands of the United States in all of these Territories. In New Mexico this could not be done as soon as in Kansas, or Nebraska, on account of the policy adopted of donations to actual settlers, who should remove there before the 1st of January, 1858, and because of the necessity of segregating the Spanish and Mexican claims from the mass of the public domain. For this reason, doubtless, local land offices were not created in New Mexico, but they were in Kansas and Nebraska, and registers and receivers appointed, with the powers and duties of similar officers in other land offices of the United States. And the President was authorized to cause the lands, when surveyed, to be exposed to sale, from time to time, in the same manner, and upon the same terms and conditions, as the other public lands of the United States. If there were no other provisions in the law than we have enumerated, we should hesitate to say, in view of the limitation on sales prescribed by law wherever public lands had been offered for sale, that they did not of themselves work a reservation of the land in controversy. In conducting the public sales the register always reserved salines, as it was his duty to do, when marked on the plats, and this was never omitted except by the neglect of the surveyors-general or their deputies. But the fourth section of the act removes all doubt upon that subject. That section declares that none of the provisions of this act shall extend to mineral or school lands, *salines*, military, or other reservations, or lands settled on or occupied for purposes of trade and commerce.

It is contended that this section applies to the donations, conceded in the preceding sections, to actual settlers in New Mexico. But why make this restriction? To do it would require the importation of the word (foregoing), so that the

section would read, none of the (foregoing) provisions shall extend to salines or mineral lands.  There is no authority to make this importation, and in this way subtract from the general words of the section.  The language of the section is imperative and leaves no room for construction.  Besides, why should an intention be imputed to Congress to exclude actual settlers from saline lands, but leave them open to private entry by speculators.  The legislation upon the subject of public lands has always favored the actual settlers, but the construction contended for would discriminate against them, and in favor of a class of persons whose interests Congress has never been swift to promote.

Apart from this, however, the purpose which Congress had in view is to be found in the unbroken line of policy in reference to saline reservations, from 1796 to the date of this act.  To perpetuate this policy, and apply it equally to all the lands of the three Territories, was the controlling consideration for the incorporation of the section, and although the words of the section are loose and general, their meaning is plain enough when taken in connection with the previous legislation on the subject of salines.  It cannot be supposed, without an express declaration to that effect, that Congress intended to permit the sale of salines in Territories soon to be organized into States, and thus subvert a long-established policy by which it had been governed in similar cases.  If anything were needed to show that the fourth section did reserve salines from sales, it can be found in the act of 3d of March, 1857,* rearranging the land districts in Nebraska. This act excepts from sale such lands " as may have been reserved."  This is a declaration that lands had been reserved, and obviously it is a legislative construction of the fourth section of the act of 1854, for nowhere else, except by implication, had there been reservations of any sort in the Territory of Nebraska.

Besides this, the Nebraska enabling act of April 10th, 1864,† affords still further evidence that the act of 1854 was

---

* 11 Stat. at Large, 186.                    † 13 Id. 47.

intended to reserve salines. The purpose of reserving them was to preserve them for the use of the future States, and no State had been organized without a grant of salt springs. In some of the States the grant was of all within their boundaries, but on the admission of Missouri, and since, the number was limited to twelve. This number, with a certain quantity of contiguous lands, were granted to Nebraska on her admission. In doing this Congress must have assumed that the springs had been reserved from sale, for if this had not been done, the presumption is there would have been nothing for the grant to operate upon. It may be true, that lands only fit for agriculture will remain a long time unentered, but this would never be the case with lands whose surface was covered over with salt. It would be an idle thing to make a grant of such lands, if there had been a previous right of entry conceded to individuals. This was in the mind of Congress, and induced the reservation in the act of 1854, by means of which Nebraska could be placed on an equal footing with other States in like situation.

But it is said the locations in question are ratified by the proviso to the section granting the salt springs. This proviso was as follows: "Provided that no salt spring or lands, *the right whereof is now vested in any individual* or individuals, or which hereafter shall be confirmed or adjudged to any individual or individuals, shall by this act be granted to said State." This provision, with an unimportant change in phraseology, was first introduced into the enabling act for Missouri,* and exactly similar provisions with the one in question were inserted in the acts relating to Arkansas and Kansas.† The real purpose of the proviso is to be found in the situation of the country embraced in the Louisiana purchase. The treaty of Paris of April 30th, 1803, by which the "province of Louisiana" was acquired, stipulated for the protection of private property. This comprehended titles which were complete as well as those awaiting completion,‡

---

* 3 Stat. at Large, 547, § 6.        † 5 Id. 58; 12 Id. 126.
‡ Soulard *v.* United States, 4 Peters, 511.

and Congress adopted the appropriate means for ascertaining and confirming them. They were numerous and of various grades, and covered town sites and every species of lands. In Missouri, as the records of this court show, they were quite extensive, and when she was admitted into the Union many of these titles were perfect and still a large number imperfect. In this condition of things Congress thought proper in granting the salt springs to the State to say, that no salt springs, *the right whereof now is* or shall be confirmed or adjudged to any individual, shall pass under the grant to the State. Whether this legislation was necessary to save salt springs claimed under the French treaty, it is not important to determine, but manifestly it had this purpose in view and nothing more. It could not refer to salt springs not thus claimed, because all entry upon them was unlawful, on account of previous reservation. It speaks of confirmations which had been made and those which were awaiting governmental action, and in this condition were all the titles the United States were bound to protect.

Although the words employed in the first division of the proviso to the saline grant to Nebraska are not the same as those used in the Missouri grant, they mean the same thing. There can be no difference between a right which has been confirmed and one which is now vested. Both are perfect in themselves, and refer to completed claims, while the last division in each proviso has reference to claims in course of completion but not finally passed upon. This proviso can have little significance in the enabling act of Nebraska, nor indeed in many other enabling acts, but Congress doubtless thought proper to introduce it out of the superabundance of caution, as there could be no certainty that in purchased or conquered territory, however remote from settlement, there might not be private claims protected by treaty stipulations to which it would be applicable. It cannot be invoked, however, for the protection of these plaintiffs. When a vested right is spoken of in a statute, it means a right lawfully vested, and this excludes the locations in question, for they were made on lands reserved from sale or

entry. If Congress had intended to ratify invalid entries like these, they would have used the language of ratification. Instead of doing this, the language actually employed negatives any idea that Congress intended to give validity to any unauthorized location on the public lands.

The Pre-emption Act of the 4th of September, 1841,* declares that "no lands on which are situated *any known* salines or mines shall be liable to entry;" differing in this respect from the acts of 1796 and 1854, which reserve every " salt spring " and " salines." The salines in this case were not hidden as mines often are, but were so incrusted with salt that they resembled " snow-covered lakes," and were consequently not subject to pre-emption. Can it be supposed that a privilege denied to pre-emptors in Nebraska was conceded in the act of 1864 to persons less meritorious?

It appears by the record, that on the survey of the Nebraska country, the salines in question were noted on the field-books, but these notes were not transmitted to the registers' general plats, and it is argued that the failure to do this gave a right of entry. But not so, for the words of the statute are general and reserve from sale or location *all* salines, whether marked on the plats or not.

What effect the statute might have on salines hidden in the earth, not known to the surveyor or the locator, but discovered after entry, may become a question in another case. It does not arise in this. Here, the salines were not only noted on the field-books, but were palpable to the eye. Besides this, the locators of the warrants, before they made their entries, were told of the character of the lands. Indeed, it is quite clear that the lands were entered solely on account of the rich deposits of salt which they were supposed to contain.

It does not strengthen the case of the plaintiffs that they obtained certificates of entry, and that patents were subsequently issued on these certificates. It has been repeatedly decided by this court that patents for lands which have been

---

* 5 Stat. at Large, 456.

Opinion of the court.

previously granted, reserved from sale, or appropriated, are void.* The executive officers had no authority to issue a patent for the lands in controversy, because they were not subject to entry, having been previously reserved, and this want of power may be proved by a defendant in an action at law.†

JUDGMENT AFFIRMED.

---

* Polk *v.* Wendell, 9 Cranch, 99; Minter *v.* Crommelin, 18 Howard, 88; Reichart *v.* Felps, 6 Wallace, 160.

† Minter *v.* Crommelin, *supra.*