## MILNER et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. November 15, 1915.)

No. 4454.

1. PUBLIC LANDS ⊜52—GRANTS—EXCEPTION OF COAL LANDS.

Whether public lands are to be classed as coal lands, and are excepted from a grant as such, does not depend on whether coal in paying quantity and of commercial quality is actually disclosed in the land, but may be determined by other circumstances, such as their location with reference to other known and proved coal land.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 139–142, 146, 147; Dec. Dig. ⊜52.]

2. PUBLIC LANDS ⊜106—CERTIFICATION OF LAND UNDER GRANT—CONCLUSIVENESS OF FINDING.

The certification of land by the Land Department under a grant which excludes from its operation mineral and coal lands is not conclusive upon the United States as to the character of the land, where the Department acted upon ex parte statements or proofs which were false and fraudulent.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 104, 301, 302; Dec. Dig. ⊜106.]

3. PUBLIC LANDS ⊜52—CONSTRUCTION OF GRANT—EXCEPTION OF MINERAL AND COAL LANDS.

The grant of lands to the state of Utah by Enabling Act July 16, 1894, c. 138, §§ 8, 12, 28 Stat. 109, 110, to be selected and used for the building and maintenance of a university, an agricultural college, etc., is qualified by the provision of Rev. St. 2318 (Comp. St. 1913, § 4613), that "in all cases lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law," and does not apply to mineral or coal lands.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 139–142, 146, 147; Dec. Dig. ⊜52.]

4. PUBLIC LANDS ⊜120—SELECTIONS UNDER GRANT—CANCELLATION FOR FRAUD.

Statements made in applications to a state for the purchase of lands to be selected by the state under a congressional grant, with respect to the character of the lands, and pursuant to which such lands were selected and certified to the state, held false and fraudulent, and to entitle the United States to a decree quieting its title to the lands.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. ⊜120.]

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the District of Utah; J. A. Marshall, Judge.

Suit in equity by the United States against Truth A. Milner, executrix of the will of Stanley B. Milner, deceased, and others. Decree for the United States, and defendants appeal. Affirmed.

H. C. Edwards, of Salt Lake City, Utah, for appellants.

William W. Ray, U. S. Atty., of Salt Lake City, Utah (David S. Cook, Asst. U. S. Atty., of Salt Lake City, Utah, on the brief), for the United States.

Before CARLAND, Circuit Judge, and AMIDON and VAN VALKENBURGH, District Judges.

CARLAND, Circuit Judge. This is an action by appellee to quiet the title to 5,564.28 acres of land situated in the county of Carbon, state of Utah. It is claimed by appellee that whatever apparent interest appellants have in the land was obtained by fraud, with the exception of Peter N. Campbell, who claims to have a lien by mortgage. Appellee was granted the relief prayed for in the court below, and appellants appeal.

Before proceeding to discuss, the questions involved on this appeal, it is proper to state that by sections 8 and 12 of the act of Congress approved July 16, 1894 (28 Stat. 109), there was granted to the state of Utah in the form of what is generally known as a "floating grant," many thousands of acres of land for the purpose of erecting an agricultural college, a school of mines, and a deaf and dumb asylum. Such lands were to be selected by the state from the unappropriated public lands of the United States in such manner as the Legislature thereof should provide, with the approval of the Secretary of the Interior. In 1896 the Legislature of Utah created a board of land commissioners and gave to it the control and management of the lands so granted. Laws Utah 1896, c. 80. The board was also empowered to select and register such lands, and after this was done it was its duty to take such action as was necessary to secure the approval of the Secretary of the Interior and a final transfer of said selected lands to the state.

Between December 10, 1900, and September 14, 1903, appellants Stanley B. Milner, Truth A. Milner, Harley O. Milner, and Samuel H. Gilson made application to said board of land commissioners to purchase the land involved in this action. The application to purchase by Truth A. Milner, who was the wife of Stanley B. Milner, was made by said Stanley B. Milner as the agent of his wife. The application to purchase made by Harley O. Milner was made by Stanley B. Milner as agent. The following is the form of the application to purchase made in each instance by the appellants:

"Agreement to Purchase Selected Lands.

"County of Salt Lake, State of Utah—ss.:

"Personally appeared before me, a notary public in and for Salt Lake county, Utah, Truth A. Milner, by S. B. Milner, Agt., of Salt Lake City, Utah, well known to me, who, being first duly sworn according to law, deposes and says

that he hereby makes application to the state board of land commissioners for the selection by the state of the following described grazing lands (name the class):

No. Acres 320

| | Sec. | Tp. | R. | S. | L. | M. |
|---|---|---|---|---|---|---|
| N1/2 | 26 | 12 S | 11 E | | | |

in satisfaction of any grant to the State.

"That he is a native-born citizen of the United States, over the age of 21 years, and that he has not purchased from the state of Utah, under the provisions of the land laws, more than four sections of grazing lands, or 320 acres of arid lands, or 160 acres of any other one class not named, together with the land now applied for; that he hereby agrees to purchase said land upon the following conditions:

"1. That after said lands shall have been selected by the state of Utah and a patent therefor has been issued to the state by the authorized officers of the United States, affiant will purchase the land at private sale at the rate of one dollar and 50 cents per acre on ten years' time, in accordance with the provisions of the law governing land sales.

"2. The sum of 80 dollars and ——— cents, being 25 cents per acre for the land embraced in the application, is herewith deposited with the state board of land commissioners to be applied as first payment on such land after the same shall have been patented to the state.

"3. That if the said land shall hereafter be determined to be mineral in character, or if any person other than the state shall be determined to have a superior right or claim to said land, then, in either of said events, the state of Utah shall be released from all obligations under this agreement.

"4. That he will not remove any timber from said land until he has executed to the state a bond conditioned that he will pay the full contract price for said land according to the terms of sale.

"5. That the state of Utah, by its proper officers, will agree to select said land in satisfaction of any of the government grants to the state in accordance with the laws of Utah, and, when so selected and patented to the state, will sell to affiant the same at private sale, for $1.50 per acre.

"Truth A. Milner,
"By S. B. Milner, Agent.

"Subscribed and sworn to before me this 17th day of April, 1901.
"[Seal]                    Ellridge L. Thomas, Notary Public."

"Salt Lake City, Utah, Apr. 22, 1901.

"The state of Utah hereby agrees to the foregoing conditions, and the order for said selection is hereby made and approved.

"By order of State Board of Land Commissioners. BYRON GROO, Secretary."

Each one of these applications was accompanied by an affidavit of each applicant, or his or her agent, of the tenor and effect following:

"State of Utah, County of Salt Lake—ss:

"April 18, 1901.

"S. B. Milner, Agent, being duly sworn according to law, deposes and says that he is the identical person who made application to select the land described in the agreement, of which this is a part, and who proposes to purchase the said land from the state of Utah; that he is well acquainted with the character of said described land, and with each and every legal subdivision thereof, having frequently passed over the same; that his personal knowledge of said land is such as to enable him to testify understandingly with regard thereto; that there is not, to his knowledge, within the limits thereof, any vein or lode of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, or copper, or any deposit of coal; that there is not within the limits of said land, to his knowledge, any placer, cement, gravel, or other valuable mineral deposit; that no portion of said land is claimed for mining purposes, under the local customs or rules of miners or otherwise; that no portion of said land is worked for mineral during any part of the year by any person

228 F.—28

or persons; that said land is essentially nonmineral land; and that his application therefor is not made for the purpose of fraudulently obtaining title to mineral land, but with the object of securing said land for agricultural purposes.                                                                S. B. Milner, Agent.

"Subscribed and sworn to before me this 18th day of April, 1901.
"[Seal]                                                    Ellridge L. Thomas, Notary Public."

The board of land commissioners appointed Heber M. Wells and Byron Groo, who were respectively the president and secretary of said board, as selecting agents for the state. When a list of lands had been selected, these selecting agents filed it in the United States local land office at Salt Lake City, Utah. Said list was accompanied by the joint affidavit of said Heber M. Wells and Byron Groo of the tenor and effect following:

"State of Utah, County of Salt Lake—ss.:

"We, Heber M. Wells and Byron Groo, authorized agents of the state board of land commissioners of the state of Utah, being first duly sworn, depose and say that the foregoing list of lands, hereby selected, is a correct list of a portion of the public lands selected by the state of Utah, under section 12 of an act of Congress entitled 'An act to enable the people of Utah to form a Constitution and state government, and to be admitted into the Union on an equal footing with the original states,' approved July 16, 1894; that all of the said lands are vacant, unappropriated, and are not interdicted, mineral, nor reserved lands, and are of the character contemplated by the grant in said act; that we have caused the lands mentioned to be carefully examined by agents and employés of the state as to their mineral or agricultural character; that there is not, to our knowledge, within the limits thereof, any vein or lode of quartz or other rock in place, bearing gold, silver, cinnabar, lead, tin, or copper, or any deposit of coal; that there is not within the limits of said land, to our knowledge, any placer, cement, gravel, or other valuable mineral deposit; that no portion of said land is claimed for mining purposes under the local customs, or rules of miners, or otherwise; that no portion of said land is worked for mineral during any part of the year by any person or persons; that said land is essentially nonmineral land, and that our application therefor is not made for the purpose of fraudulently obtaining title to mineral land, but with the object of securing said land for agricultural purposes, and the above and foregoing statements as to the character of said land apply to each and every legal subdivision thereof; that the said selections and those pending, together with those approved, do not exceed the total amount granted to the state for the purpose named.

"that the land contains no salt spring or deposits of salt in any form sufficient to render it valuable therefor.                Heber M. Wells,
                                                   Byron Groo,
                "Agents for the State Board of Land Commissioners.

"Subscribed and sworn to before me this 15th day of September, 1903.
                                "Ellridge L. Thomas, Notary Public."

After the list of selected lands was filed in the local United States land office, the register and receiver of said land office made a certificate as follows:

"United States Land Office.

"Salt Lake City, Utah, September 15th, 1903.

"We hereby certify that we have carefully and critically examined the foregoing list of lands selected by the state of Utah, under the grant to it by the act of Congress, entitled 'An act to enable the people of Utah to form a Constitution and state government, and to be admitted into the Union on an equal footing with the original states,' approved July 16, 1894, and we have tested the accuracy of said list by the plats and records in the office, and we find the same to be correct; and we further testify that the filing of said

list has been allowed and approved, and that the whole of said lands are surveyed public lands of the United States, and that the same are not, nor is any part thereof, returned and denominated as mineral lands, or lands, nor claimed as swamp land; neither are there any homesteads, pre-emptions, nor other valid claim to any portion of said land on file or record in this office. We further certify that the foregoing list shows an assessment of the fees payable to us, and that the said state of Utah has paid to the undersigned, the receiver, the full sum of twenty dollars in full payment and discharge of said fees.                                         Frank D. Hobbs,

"Register U. S. Land Office, Salt Lake City, Utah.
"Geo. A. Smith,
"Receiver U. S. Land Office, Salt Lake City, Utah."

The list of selected lands was then forwarded to the Commissioner of the General Land Office, accompanied by the following statement:

"State Board of Land Commissioners.
"Salt Lake City, Utah, September 15th, 1903.

"I, Byron Groo, secretary of the state board of land commissioners of the state of Utah, hereby certify that Heber M. Wells and Byron Groo are the duly appointed agents of said board for the selection of lands under the grants by the United States to the state of Utah.                   Byron Groo,

"Secretary State Board of Land Commissioners.

"List No. 52.   Deaf and Dumb Asylum.

"List of Lands Selected by State of Utah.

"The undersigned, the duly authorized agents of the state board of land commissioners of the state of Utah, under and by virtue of the act of Congress entitled 'An act to enable the people of Utah to form a Constitution and state government and to be admitted into the Union on equal footing with the original states,' approved July 16, 1894, and under and in pursuance of the rules and regulations prescribed by the Commissioner of the General Land Office, hereby make and file the following list of selections of the surveyed, unappropriated, unreserved, nonmineral public lands of the United States lying within the state of Utah, said lands being selected and to be applied under section 12 of said act of Congress 'for the establishment and maintenance of a deaf and dumb asylum.'                                   Heber M. Wells,
"Byron Groo,
"Agents for the State Board of Land Commissioners.
"Approved by Commissioner General Land Office December 1, 1904."

The application to purchase made by Stanley B. Milner was approved by the board of land commissioners on December 17, 1900, by the local land office on December 18, 1900, and the land certified to the state of Utah by the General Land Office June 22, 1901.

There were two applications by Truth A. Milner, by Stanley B. Milner, her agent.   One was made April 19, 1901, approved by the board of land commissioners April 22, 1901, and by the local land office April 29, 1901, and the land certified to the state of Utah by the General Land Office December 23, 1901.   The other was approved by the board of land commissioners April 2, 1902, by the local land office April 7, 1902, and the land certified to the state by the General Land Office July 9, 1902.

The application to purchase by Harley O. Milner, by his agent Stanley B. Milner, was approved by the board of land commissioners March 24, 1903, by the local land office March 30, 1903, and the land certified to the state of Utah by the General Land Office May 9, 1904.

The application to purchase by Samuel H. Gilson was approved by

the board of land commissioners December 15, 1903, by the local land office September 2, 1903, and the land certified to the state of Utah by the General Land Office December 1, 1904. The price agreed to be paid for the lands was $1.50 per acre, payable in ten annual installments. No patents from the state of Utah have been issued to the defendants for the lands in controversy, but the payments as required by the contracts of purchase have been made as therein provided.

The application to purchase and the affidavit accompanying the same, together with the representations of the selecting agents and the resulting certificate of the local land officers, was the evidence upon which the Commissioner of the General Land Office acted in approving the selections. It is claimed by the United States that the certification of the lands by the General Land Office to the state was obtained by fraud, in this: that the applicants to purchase and the selecting agents appointed by the board of land commissioners, together with the certificate of the local land officers, all showed the land to be nonmineral, and that there was no deposit of coal within the limits thereof.

The affidavit accompanying the application to purchase in each instance stated that the person making the affidavit was well acquainted with the character of the land, and with each and every legal subdivision thereof, having frequently passed over the same, that his personal knowledge of said land was such as to enable him to testify understanding with regard thereto, and that there was not to applicant's knowledge within the limits thereof any vein or lode of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, or copper, or any deposit of coal.

Appellee claims that the lands for which applications to purchase were made were coal lands, and known to be such by the several applicants. The trial court found this to be true, and that the applications to purchase, and the action of the land office officials based thereon, should be canceled, and title to the lands quieted in the United States. Appellants seek to avoid and overthrow this claim on the part of appellee on the following grounds:

1. That there was no fraudulent intention on the part of the appellants in applying to purchase the lands.

2. That the lands were not and are not coal lands, because coal is not exposed in commercially available quantities upon each legal subdivision of 40 acres.

3. That the selection of the lands in question having been made in good faith by the state of Utah under the grant of the act enabling Utah to be admitted as a state, it is immaterial whether or not the defendants falsely and fraudulently deceived and misled the selecting officers of the state of Utah as to the character of the lands.

4. That the Secretary of the Interior having certified the lands to the state of Utah under its grant, such certification is conclusive as to the fact that the lands were of such character as to permit them to be selected under the grant.

[1] Applying the rule laid down by this court in United States v. Diamond Coal & Coke Company, 191 Fed. 786, 112 C. C. A. 272, and in the same case, 233 U. S. 236, 34 Sup. Ct. 507, 58 L. Ed. 936, we

are of the opinion after a careful consideration of the evidence that the lands in controversy were at the time of their certification by the Secretary of the Interior to the state of Utah and at the several dates of purchase known coal lands. The same contention is made in this case as was made in the case cited, namely, that lands cannot be regarded as coal lands unless coal in quantity and quality to render its extraction profitable is actually disclosed within their boundaries. In answer to such a contention Justice Van Devanter in the case cited used the following language:

"There is no fixed rule that lands become valuable for coal only through its actual discovery within their boundaries. On the contrary, they may, and often do, become so through adjacent disclosures and other surrounding or external conditions; and when that question arises in cases such as this, any evidence logically relevant to the issue is admissible, due regard being had to the time to which it must relate."

The evidence shows beyond question that the lands involved in this action lie along and adjacent to what is commonly known as the "Book Cliffs," or the "Book Cliffs Coal Fields," a sedimentary formation designated as cretaceous, extending from Castle Gate, Utah, eastward to and beyond the Colorado-Utah line. The cliffs themselves form the edge of a plateau, and the coal outcropping in the cliffs extends back from the escarpment beneath the plateau lands. Throughout these deposits the coal occurs interstratified with the sedimentary rocks. Three experts examined these lands for the government and testified at the trial as to their character, and all expressed the same opinion as to the character of the lands. These lands lie immediately north of and above a pronounced coal formation upon which at the date of purchase of the lands in question four well-known coal mines were being worked upon veins of coal varying in thickness from 7 to 22½ feet; said veins dipping directly into the lands in question. It appears that at no place within the lands involved in this action does the cover above the coal exceed 2,500 feet, and the evidence is uncontroverted that coal at such depth, and of such quality and quantity as carried by the veins dipping beneath these lands, can be profitably extracted, even though it be necessary that they be mined through shafts or inclines.

As to the fraudulent intent of appellants, they must be held to have intended the natural and probable result of their acts. Gilson and Milner were both men of mature years and had great experience in the business of mining. Gilson testified that some time in 1900 he and Stanley B. Milner entered into an agreement to acquire title to certain lands in Carbon county, Utah, and they were well acquainted with the character of the lands in question, and determined they were not coal lands because there was not disclosed upon their surface coal in quantity and quality to render its extraction profitable. The affidavit accompanying each application to purchase, as we have before stated, was to the effect that the applicant was well acquainted with the character of said lands and of every legal subdivision thereof, having frequently passed over the same, and from applicant's personal knowledge was able to state that there was no deposit of coal thereon.

[2] We are satisfied that appellants knew the character of the lands

in question, and, having made false statements in regard to the same, must ·be held to have intended to defraud. Counsel for appellants cite the case of·Edmund Burke v. Southern Pacific Railroad Company, 234 U. S. 669, 34 Sup. Ct. 907, 58 L. Ed. 1527, in support of their contention that the approval by the Secretary of the Interior of the selection list containing the lands in question is final and conclusive that the lands were of the character to be certified to the state of Utah under the grant of 1894. No support for any such contention can be found in that case as applied to the facts in the case at bar.

Justice Van Devanter in the Burke'Case is careful to point out that the rule there announced as to the finality of the action of the Secretary of the Interior does not apply in cases where the officers of the United States have acted upon ex parte fraudulent and false statements. At 234 U. ١S. 689, 34 Sup. Ct. 915, 58 L. Ed. 1527, in the opinion it is said:

"Of course, if the railroad company knows at the time of receiving a patent that the lands covered by it are mineral, a case of fraud is presented which entitles the Secretary of the Interior to have the patent canceled, as was done in Morton v. Nebraska, 21 Wall. 660 [22 L. Ed. 639], and in Western Pacific Railroad Company v. United States, 107 U. S. 526, 108 U. S. 510, 2 Sup. Ct. 802, 862, 27 L. Ed., 621, 806. But, barring cases of fraud, the issuing of a patent by the Secretary of the Interior to the railroad company gives it an absolute title, not liable to be defeated by the subsequent discovery of minerals."

Again (234 U. S. 692, 34 Sup. Ct. 916, 58 L. Ed. 1527) it is said:

"Of course, if the land officers are induced by false proofs to issue a patent for mineral lands under a nonmineral land law, or if they issue such a patent fraudulently or through a mere inadvertence, a bill in equity, on the part of the government, will lie to annul the patent and regain the title, or a mineral claimant who then had acquired such rights in the.land as to entitle him to protection may maintain a bill to have the patentee declared a trustee for him; but such a patent is merely voidable, not void, and cannot be successfully attacked by strangers, who .had no interest in the land at the time the patent was issued and were not prejudiced by it. Colorado Coal & Iron Co. v. United States, 123 U. S. 307, 313 [8 Sup. Ct. 131, 31 L. Ed. 182]; Diamond Coal Co. v. United States, 233 U. S. 236, 239 [34 Sup. Ct. 507, 58 L. Ed. 936]; Germania Iron Co. v. United States, 165 U. S. 379 [17 Sup. Ct. 337, 41 L. Ed. 754]; Duluth & Iron Range Railroad Co. v. Roy, 173 U. S. 587, 590 [19 Sup. Ct. 549, 43 L. Ed. 820]; Hoofnagle v. Anderson, 7 Wheat. 212, 214, 215 [5 L. Ed. 437]."

In the case of Washington Securities Company v. United States, 234 U. ١S. 76, 34 Sup. Ct. 725, 58 L. Ed. 1220, Justice Van Devanter again said:

"It is contended also that the proceedings resulting in the patents were not ex parte, but adversary; that the land officers found the lands to be agricultural in character, and that this finding was conclusive upon the government. No doubt those officers found from the proofs submitted to them that the lands were agricultural and not coal lands, for that was a prerequisite to issuing the patents; but the proceedings were not adversary in any true sense of the term. The applications and proofs of the entrymen were strictly ex parte. The government was not called upon to make any adverse showing, no issue was framed, no hearing was had, and no one represented the government save in the sense that the land officers did so. As this court has often held, the findings of the land officers in such a proceeding, although not open to collateral attack, are not conclusive against the government when it sues to cancel the resulting patent upon the ground that it was obtained by means of false and fraudulent proofs. United States v. Minor, 114 U. S.

233 [5 Sup. Ct. 836, 29 L. Ed. 110]; McCaskill Co. v. United States, 216 U. S. 504, 509 [30 Sup. Ct. 386, 54 L. Ed. 590], and cases cited. In such a suit the action of the land officers is given appropriate effect by treating it as presumptively right and as requiring the government to carry the burden of proving the fraud by that class of evidence which commands respect and that amount of it which produces conviction. Diamond Coal & Coke Co. v. United States, 233 U. S. 236, 239 [34 Sup. Ct. 507, 58 L. Ed. 936]."

[3, 4] It is not the claim of appellee that the officers or selecting agents of the state of Utah or the land officers were guilty of fraud, but that they were imposed upon by the false statements of the appellants and relied upon the same as did the officers of the local land office at Salt Lake City. The applicants to purchase the land in question, the selecting agents of the state, and the land officers of the United States all acted on the theory that mineral lands or lands containing a deposit of coal did not pass under the grant. It is not claimed that such lands passed, in the briefs of counsel, and the pleadings practically admit the allegation of the bill that the lands granted were to be nonmineral. We are of the opinion, however, that no such contention could be sustained under the facts in this case. Section 2318, R. S. U. S. (Comp. St. 1913, § 4613), provides:

"In all cases lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law."

We held in Frederick A. Sweet, Administrator, v. United States, 228 Fed. 421, —— C. C. A. ——, that under section 6 of the act of July 16, 1894 (28 Stat. 109), which specifically granted sections 2, 16, 32, and 36 in every township of the proposed state of Utah, mineral lands passed to the state of Utah. We think, however, the case at bar is clearly distinguishable from that case. Section 6 granted specific lands without qualification or exception, and we were of the opinion that to hold that mineral lands were excepted therefrom would be to interpolate into the section by interpretation language that Congress did not choose to use. . In the present case, however, the lands are not specified in the statute, but so many thousand acres are granted to the proposed state, to be selected as stated in this opinion, and we conclude that the certification of these lands by the Secretary of the Interior did not carry mineral lands in direct opposition to section 2318, and the general policy of the United States. It was decided in Mullan v. United States, 118 U. S. 271, 6 Sup. Ct. 1041, 30 L. Ed. 170, that section 2318, above mentioned, included coal lands. Congress did not know when sections 8 and 12, supra, were enacted, what lands the state would select, and therefore could not have had any particular lands in view. When the Secretary of the Interior came to approve the selections made by the state, he was prohibited by section 2318 from approving the selection of mineral or coal lands. It appears from the record that all the agreements to purchase involved in this action were assigned to the Carbon County Land Company, of the stock of which Stanley B. Milner is the owner of 99,950 shares of a total of 100,000 shares capital stock. We find that the whole transaction was a scheme or conspiracy on the part of Milner to fraudulently obtain the ownership of these lands from the United States.

Decree affirmed.